916 F.2d 402
 The MORRIE MAGES AND SHIRLEE MAGES FOUNDATION, Morris H.
Mages, Shirlee G. Mages, Laurence F. Mages, and
Lili Ann Mages Zisook, Plaintiffs-Appellees,
v.
THRIFTY CORPORATION, a California corporation, Defendant-Appellant.
 No. 89-2354.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 14, 1990.
Decided Oct. 19, 1990.
 
 Richard G. Schultz, Carmen D. Caruso, Foran, Wiss & Schultz, Chicago, Ill., for plaintiffs-appellees.
 Peter C. Woodford, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant-appellant.
 Before BAUER, Chief Judge, WOOD, Jr., and KANNE, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Defendant Thrifty Corporation ("Thrifty") appeals from the district court's order denying Thrifty's motion for a stay of proceedings pending arbitration. This court has jurisdiction over this appeal under section 15(a)(1)(A) of the Federal Arbitration Act, 9 U.S.C. Sec. 15(a)(1)(A).
 
 I. FACTUAL BACKGROUND
 
 2
 Michigan Sporting Goods Distributors, Inc. ("MC") purchased the sporting goods business owned by the Mages, Morrie Mages Sporting Goods, in 1987. The parties' agreement is set forth in an Agreement for Purchase ("Agreement") dated July 16, 1987, a Promissory Note ("Note") executed contemporaneously with the Agreement, and a Guaranty dated July 20, 1987, which the Mages required as a condition of sale, from MC's parent corporation, Thrifty. The Agreement included an arbitration clause that required the parties to the Agreement to submit to arbitration any "controversy or claim arising out of or relating to [the] contract, or the breach thereof."
 
 
 3
 Because the Mages' business was privately held and did not have audited financial statements, the parties agreed that the purchase price in the principal sum of $6,050,000 would be subject to adjustment. MC paid the Mages $5,000,000 at the time of closing in July 1987 and delivered the Note to the Mages for the balance of the purchase price. The Note provided that on specified dates MC was to make payments of principal and interest to the Mages; the first payment was due on October 1, 1987. The Agreement and the Note both provided that MC had a right to claim set-offs against the Note based upon the accounting reviews or other inaccuracies in the Mages' financial statements.
 
 
 4
 The Note also contained a default clause providing that if MC "defaulted" in the payment of any installment of principal or interest when due, and the default continued for thirty days after the Mages provided notice of default to MC or Thrifty, the entire $1,050,000 obligation, plus interest, would become immediately due and payable. Thrifty's Guaranty provided that in the event of an uncured default by MC on the Note, Thrifty would be absolutely liable for MC's indebtedness.
 
 
 5
 Subsequent to the closing, MC determined that the value of the inventory and assets of the Mages' business had been overstated by approximately $1,000,000. A post-sale accounting of the Mages' books and records also suggested an adjustment to the purchase price of at least an additional $100,000. MC's post-closing review of the Mages' business and records therefore indicated that after an adjustment of the purchase price, it might not owe any portion of the amount recited in the Note. Thrifty maintains that the Mages contributed to the uncertainty regarding the amount of MC's remaining debt when they neglected to present their accountants' post-closing report in a timely manner as required in the Agreement.
 
 
 6
 As a result of the indefiniteness of the amount of MC's debt and the Mages' failure to submit timely accounting reports, MC withheld the October 1, 1987, payment and entered into discussions with the Mages to determine the amount owing under the Note. The Mages then declared MC in default and demanded that MC immediately pay the Mages $1,050,000, which was the full amount of the note without adjustment. MC refused to make any accelerated payment until the dispute over the amount due under the Note was resolved. The Mages and MC continued their attempts to amicably resolve their differences until the Mages filed this lawsuit against Thrifty for breach of the Guaranty on August 30, 1988. Because the Mages did not seek arbitration of the dispute, MC filed a demand for arbitration within thirty days of the filing of the Mages' suit against Thrifty.
 
 
 7
 On October 5, 1988, Thrifty moved for a stay of the case in district court pending the outcome of the arbitration between MC and the Mages. The district court issued an order denying Thrifty's motion on May 31, 1989. The district court essentially held that Thrifty had failed to incorporate an arbitration clause into its Guaranty and that Thrifty and MC were in default in proceeding with arbitration. The district court found that Thrifty's liability under the Guaranty was for the full amount of the Note due to MC's "default"--MC's failure to make its payments to the Mages.
 
 
 8
 Thrifty asserts that the district court's denial of its motion for a stay will allow the Mages to avoid the parties' agreed-upon remedy of arbitration and subject Thrifty to potentially inconsistent results between the MC-Mages arbitration and the Thrifty-Mages litigation. Thrifty argues that it has an absolute right to a stay because it was a party to the arbitration agreement. Moreover, Thrifty maintains that regardless of its status as a party to the arbitration agreement, it was entitled to a stay because section 3 of the Federal Arbitration Act, 9 U.S.C. Sec. 3, requires that a district court stay litigation where issues presented in the lawsuit are subject to arbitration. In the event that we find Thrifty did not have an absolute right to a stay, Thrifty alternatively urges us to rule that the district court abused its discretionary power in not staying the case. As a preliminary matter, we must examine the district court's finding that neither MC nor Thrifty was entitled to arbitrate their dispute with the Mages because their belated request for arbitration resulted in a "default" or "waiver" of their arbitration rights.
 
 II. WAIVER OF ARBITRATION RIGHTS
 
 9
 The Mages and the district court identified several aspects of MC and Thrifty's conduct that resulted in a waiver of their right to arbitration. Like the district court, we will assume for the sake of argument that Thrifty had a right to arbitration that it could waive.
 
 
 10
 The Mages alleged and the district court found that both MC and Thrifty waived their arbitration rights when MC failed to make its payments under the Note and neither Thrifty nor MC cured the "default." The Mages and the district court, however, confused MC's possible "default" under the Note in paying the Mages with the sense in which the word "default" is used to signify that a party has waived its arbitration right by acting inconsistently with that right. When a party moves to stay judicial proceedings and compel arbitration, a court "may consider only issues relating to the making and performance of the agreement to arbitrate." Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). The district court did more than construe the arbitration agreement, it considered matters that the parties had contracted to refer to an arbitrator. Whether MC defaulted under the Note and the extent of its debt to the Mages were issues the parties agreed to arbitrate under the Agreement, which broadly stated that "[a]ny controversy or claim arising out of or relating to this contract, or the breach thereof, will be settled by arbitration...." Thrifty does not dispute that it is absolutely liable under the Guaranty for MC's indebtedness once the arbitrator resolves the dispute concerning the purported default and amount of MC's set-off. The preliminary issue of waiver of arbitration rights, however, is a different inquiry than that conducted by the district court.
 
 
 11
 The district court declared MC's failure to pay to be a default under the Note and stated that Thrifty became absolutely liable when there was no cure within the passage of time specified in the Guaranty. The parties had agreed, however, that any controversy concerning the contract would be settled by an arbitrator. Due to the broad arbitration agreement, the district court was precluded from characterizing MC's conduct as a default and declaring Thrifty absolutely liable under the Guaranty unless MC waived its right to have such issues decided in the agreed-upon forum.
 
 
 12
 Arbitration is a waiveable contract right, Ohio-Sealy Mattress Mfg. Co. v. Kaplan, 712 F.2d 270, 273 (7th Cir.), cert. denied, 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); Dickinson v. Heinold Securities, Inc., 661 F.2d 638, 641 (7th Cir.1981), but a "waiver of arbitration is not lightly to be inferred." Midwest Window Systems, Inc. v. Amcor Indus., Inc., 630 F.2d 535, 536 (7th Cir.1980). The party seeking to prove a waiver of arbitration rights has a "heavy burden." Ohio-Sealy, 712 F.2d at 273. There is no rigid rule as to what constitutes a waiver of an arbitration agreement; the crucial question is whether, under the circumstances of the particular case, the defaulting party acted " 'inconsistently' with the arbitration right." Midwest Window, 630 F.2d at 537 (quoting Shinto Shipping Co. v. Fibrex & Shipping Co., 572 F.2d 1328, 1330 (9th Cir.1978)); see also Ohio-Sealy, 712 F.2d at 273. One of the relevant circumstances is the prejudice suffered by the objecting party as a result of the acts purportedly constituting waiver. Dickinson, 661 F.2d at 641 n. 5 (citing Midwest Window, 630 F.2d at 537).
 
 We noted in Dickinson that
 
 13
 [p]reliminary negotiations concerning a settlement are not sufficient to waive arbitration. Southwest Industrial Import & Export Inc. v. Wilmod Co., 524 F.2d 468, 470 (5th Cir.1975). Significant periods of delay prior to the onset of litigation are often necessary to allow the parties to engage in good faith efforts to resolve the controversy without reference to an adjudicatory body.
 
 
 14
 661 F.2d at 641. We find that MC did not act inconsistently with its arbitration right nor did it wait an inordinate period of time before seeking arbitration. That MC did not seek arbitration until after the filing of the Mages' suit is also of no moment. The parties continuously sought to settle their differences without resort to an arbitrator or a court. After the Mages filed their complaint against Thrifty, MC made its arbitration demand at an early stage of the judicial proceedings. No discovery had taken place and there had been no argument or decision on the merits of the action. An opponent to arbitration is not prejudiced simply because an arbitration demand was not made until after judicial proceedings had begun. See, e.g., American Home Assurance Co. v. Vecco Concrete Constr. Co., 629 F.2d 961, 963-64 (4th Cir.1980) (where contractor moved for stay shortly after subcontractor filed claim against it, contractor proceeded with arbitration demand in timely fashion and did not waive it); Clar Productions, Ltd. v. Isram Motion Pictures Prod. Services, Inc., 529 F.Supp. 381, 383 (S.D.N.Y.1982) (defendant did not waive arbitration right even though it was not asserted for seven months after complaint was filed where no discovery or action on the merits had taken place). Neither MC nor Thrifty engaged in conduct evincing a desire to resolve their dispute with the Mages in a judicial forum. Promptly after MC demanded arbitration, Thrifty moved to stay the Mages' lawsuit. There is no evidence that the Mages were prejudiced by MC and Thrifty's attempts to settle their dispute with the Mages short of arbitration or a trial. In sum, the district court erred in ruling that MC and Thrifty's conduct resulted in a waiver of any arbitration rights.
 
 
 15
 III. THRIFTY'S RIGHT TO A STAY UNDER SECTION 3
 
 
 16
 Congress's enactment of the Federal Arbitration Act ("FAA") created national substantive law controlling all issues concerning the validity and enforceability of covered arbitration agreements and reflected a strong federal policy favoring arbitration as a means of dispute resolution. See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218-21, 105 S.Ct. 1238, 1241-43, 84 L.Ed.2d 158 (1985); Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22-23, 103 S.Ct. 927, 940-41, 74 L.Ed.2d 765 (1983); McCowan v. Sears, Roebuck and Co., 908 F.2d 1099, 1106 (2d Cir.1990), cert. denied --- U.S. ----, 111 S.Ct. 250, 112 L.Ed.2d 209 (1990). Under the terms of the FAA, district courts have no discretion to refuse a request for a stay and shall direct the parties to proceed to arbitration on issues covered by an arbitration agreement. 9 U.S.C. Secs. 3, 4. The Supreme Court has noted that when interpreting an arbitration clause, district courts must refer disputes to an arbitrator "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Relying on section 3 of the FAA, Thrifty argues that the district court was obliged to stay the Mages' lawsuit, regardless of Thrifty's status as a party to the arbitration agreement,[1] because issues presented in the litigation are subject to arbitration.
 
 Section 3 of the FAA provides:
 
 17
 Sec. 3. Stay of proceedings where issue therein referable to arbitration
 
 
 18
 If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.
 
 
 19
 (emphasis added). We adopt the "commonsense reading" of this section urged by Thrifty and articulated by the Second Circuit in McCowan, 908 F.2d at 1106: if the federal action concerns an "issue referable to arbitration" under the terms of the arbitration agreement, the district court must stay the trial until the arbitration has concluded.
 
 
 20
 In McCowan, the plaintiff filed two separate lawsuits arising from the same transactions. One lawsuit ("McCowan I ") was against Dean Witter for allegedly fraudulent conduct in managing the plaintiffs' securities account, and the other lawsuit ("McCowan II ") sought damages only against Sears, Roebuck and Co. and alleged "controlling person liability" pursuant to state law (Dean Witter was, however, a nominal defendant in the second case). The plaintiffs had an arbitration agreement with Dean Witter but did not have one with Sears. Dean Witter eventually succeeded in getting several claims in McCowan I referred to arbitration and the remaining claims were dismissed. Dean Witter and Sears both sought a mandatory stay of McCowan II pursuant to section 3 of the FAA. The district court denied Dean Witter's motion and Sears' motion, ruling that the dispute in McCowan II was only between the plaintiffs and Sears and that Sears was not a party to the arbitration agreement.
 
 
 21
 While the Second Circuit did not reach the issue of whether Sears (the disputed party to the arbitration agreement) had a right to a mandatory stay under section 3, which is the issue presented in this case, the court did find that the district court should have granted Dean Witter's motion for a stay because of the adverse effects McCowan II could have on the pending arbitration:
 
 
 22
 We believe that the absence of a request for relief against Dean Witter does not determine whether a controversy exists between Dean Witter and plaintiffs.... Although fashioned as two separate lawsuits, there is in reality a single "controversy" at issue--as that term would have been understood by the contracting parties--giving rise to claims under three separate laws: the 1934 Act, RICO and the Virginia Securities Act. The first two [raised in McCowan I ] demand a money judgment from Dean Witter; the third requires a showing of liability against Dean Witter as a predicate to recovery against Sears, but demands no monetary judgment from Dean Witter. Dean Witter's contractual right to arbitrate "any controversy" arising out of or relating to the contract between the parties would be seriously impaired if McCowan II were not stayed pending arbitration.
 
 
 23
 Id. at 1106-07. The court also found that the arbitrator's pending consideration of the federal claims against Dean Witter "would be impaired since any issues determined against Dean Witter in court proceedings in McCowan II could have collateral estoppel effect on the arbitration" because of the similarity between the elements of the alleged state and federal violations. Id. at 1107 (citing Dickson v. Heinold Securities, Inc., 661 F.2d 638, 644 (7th Cir.1981); Mansbach v. Prescott, Ball, Turben, 598 F.2d 1017, 1031 (6th Cir.1979)).
 
 
 24
 As in McCowan, the claim in this case requires a showing of liability against MC, an undisputed party to the arbitration agreement, as a predicate to recovery against Thrifty, a disputed party to the arbitration agreement. Also as in McCowan, there is a potential for impairment of the issues before the arbitrator due to the collateral estoppel effect of the Mages-Thrifty litigation. Because we have determined that there was no waiver of the right to arbitration, the amount of Thrifty's liability under the Guaranty (if indeed Thrifty is liable) is coterminous with the amount of MC's liability under the Note and Agreement. The resolution of the issue of whether Thrifty is liable under the Guaranty and the extent of such liability is thus completely dependent upon the arbitrable issues of the fact and extent of MC's liability.
 
 
 25
 Section 3 of the FAA plainly requires that a district court stay litigation where issues presented in the litigation are the subject of an arbitration agreement. The Mages' attempts to distinguish Thrifty's absolute liability under the Guaranty from MC's liability under the Note and Agreement are spurious. Under the plain language of the contract as a whole, Thrifty's indisputable absolute liability does not arise until an arbitrator resolves the issues of whether MC defaulted under the Note and Agreement or properly exercised its right to set off the adjusted purchase price of the sale, the need and accuracy of post-sale accounting adjustments, and the value of the Mages' assets and the size of their business' liabilities. The litigation against Thrifty, as in McCowan, is an attempt by the plaintiffs to evade the agreed-upon resolution of their disputes in the arbitration forum by introducing the identical controversy in a judicial forum against a party who is ultimately liable for the arbitrating party's acts. Thrifty, as a party to litigation involving issues subject to an arbitration agreement, is entitled to a stay under section 3 of the FAA regardless of its status as a party to the arbitration agreement. See, e.g., United States v. American Employers Ins. Co. of Mass., 290 F.Supp. 139, 140-41 (D.C.S.C.1968) (where subcontract stated that "any controversy or claim arising out of or relating to this sub-contract or any breach thereof shall be settled by arbitration ...," the court stayed litigation between plaintiff and surety under the contract, finding that plaintiff had to first comply with its obligation to arbitrate); Tepper Realty Co. v. Mosaic Tile Co., 259 F.Supp. 688, 692-93 (S.D.N.Y.1966) (irrelevant whether moving party was party to the arbitration agreement; court analogized to cases construing section 3's broad command to allow federal courts to stay litigation under Sec. 3 even where they lack jurisdiction to compel arbitration under Sec. 4); Schilling v. Canadian Foreign Steamship Co., 190 F.Supp. 462, 463 (S.D.N.Y.1961) (party to litigation that "had agreed to stand responsible for any proven default [of subcharterer]" could seek to stay litigation under 9 U.S.C. Sec. 3 even though subcharterer had not appeared in the litigation).
 
 IV. CONCLUSION
 
 26
 In this opinion we have directly addressed those arguments that the parties advanced which merited a full discussion. We have omitted a separate discussion of those claims that were based on a strained and selective reading of the Agreement, Note, and Guaranty. Nonetheless, we have considered each claim not discussed and found that they lacked merit. Because there was no waiver of the arbitration right and Thrifty is entitled to a mandatory stay under section 3 of the FAA, we REVERSE the judgment of the district court and REMAND this case for an imposition of a stay pending the conclusion of the Mages-MC arbitration.
 
 
 
 [1]
 Thrifty's alternative claim that it is entitled to a stay because it is a party to the arbitration agreement is belied by the record. The Guaranty does not contain an arbitration clause and does not incorporate the arbitration provision of the Agreement between the Mages and MC. See Interocean Shipping Co. v. National Shipping and Trading Corp., 523 F.2d 527, 539 (2d Cir.1975) ("A mere guarantor of a charter party generally cannot be compelled to arbitrate on the basis of an arbitration clause in the main agreement since it is not a party to that contract ...; [o]rdinary contract principles determine who is bound."), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). We also reject Thrifty's alternative argument that it is "aggrieved" by the Mages' failure to arbitrate and may on that basis alone compel or participate in arbitration under 9 U.S.C. Sec. 4. Section 4 provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court" for an order compelling arbitration. Thrifty never filed a motion to compel arbitration under section 4, so section 4 can hardly serve as a basis for reversal of the district court's ruling on Thrifty's motion for a stay under section 3