ASPLUNDH TREE EXPERT
COMPANY, Plaintiff–
Appellant,

v.

Robert E. BATES, Defendant–Appellee.

No. 94–5563.

United States Court of Appeals,
Sixth Circuit.

Argued July 27, 1995.

Decided Dec. 14, 1995.

V. Thomas Fryman, Jr. (briefed), Greenebaum, Doll & McDonald, Lexington, KY, Walter P. Loughlin (argued and briefed), Vincent P. Esposito, Jr., Geoffrey S. Berman, Jeffrey T. Wald, Mudge, Roes, Guthrie, Alexander & Ferdon, New York City, Phillip E. Tatoian, New York City, for Plaintiff–Appellant.

Thomas A. Carroll (argued and briefed), Owensboro, KY, for Defendant–Appellee.

Before: MILBURN and NORRIS, Circuit Judges; GRAHAM, District Judge.*

GRAHAM, District Judge.

Plaintiff–Appellant, Asplundh Tree Expert Co. ("Asplundh"), brought this action in the United States District Court for the Western District of Kentucky seeking to enjoin an arbitration proceeding commenced by the defendant Robert E. Bates ("Bates"). In May of 1990, Asplundh purchased all of the outstanding shares of Vanguard Meter Service, Inc. ("Vanguard") for seven million dollars. Bates was the controlling shareholder and chairman of the board of Vanguard. The stock sale agreement provided that the day-to-day management of the company would remain with the sellers for a period of five years. The agreement also contained representations that there were no undisclosed liabilities and no pending or anticipated legal actions, as well as the usual warranties regarding the accuracy of the corporation's financial statements. On the same date, May 22, 1990, Vanguard entered into an employment agreement with Bates ("first employment agreement"), employing him as the chief executive officer of Vanguard for a period of sixty months at a base salary of two hundred and forty thousand dollars per year, plus fringe benefits. The agreement required Bates to devote his entire working time to the affairs of Vanguard.

Approximately six months later, in January of 1991, the United States Attorney's Office for the Southern District of New York and the New York County District Attorney's Office commenced grand jury investigations of Vanguard and its management, including Bates, for possible violations of state and federal prevailing wage laws. This marked the beginning of serious financial problems for Vanguard. On August 20, 1991, Bates resigned as the chief executive officer of Vanguard and entered into a new employment agreement with Vanguard bearing that date (the "second employment agreement"). On the same date, Bates, Vanguard and Asplundh signed a letter (the "letter agreement") in which Vanguard promised, among other things, to pay Bates' legal fees in the defense of any criminal action unless he was convicted of a crime based upon willful actions outside the scope of his employment. The second employment agreement designated Bates as a consultant and stipulated that he would not be required to render employment services on a day-to-day basis. The second employment agreement maintained the original base salary of two hundred and forty thousand dollars per year but eliminated some of the fringe benefits. The second employment agreement, like the first, contained an arbitration clause which provided, *inter alia:*

> [A]ll claims, disputes and other matters in question arising out of, or relating to this agreement, or the breach hereof, shall be decided by arbitration in accordance with the then current commercial arbitration rules of the American Arbitration Association.

On October 24, 1991, as a consequence of Vanguard's deteriorating financial condition and the government investigations, Bates and the other original shareholders of Vanguard executed a written amendment to the stock sale agreement yielding operational control of Vanguard to Asplundh. On November 5, 1991, a New York County grand jury returned a two hundred and six count

---

* The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

indictment charging Bates, Vanguard and other former Vanguard officers with various criminal offenses, including fraud, grand larceny, perjury and filing of false instruments, based on Vanguard's alleged violation of the New York Labor Law.

On December 4, 1991, Asplundh commenced an action against Bates and the other sellers of Vanguard stock in the United States District Court for the Southern District of New York alleging securities fraud and other claims arising out of the stock purchase agreement. On December 3, 1991, Bates and the other sellers filed suit against Asplundh in the United States District Court for the Western District of Kentucky alleging that Asplundh mismanaged Vanguard and breached the stock sale agreement. This action was subsequently transferred to the Southern District of New York.

On December 27, 1991, Bates initiated an arbitration proceeding against Vanguard and Asplundh by filing an arbitration demand with the American Arbitration Association ("the AAA") alleging breach of the second employment agreement and the letter agreement by the failure to pay his salary, fringe benefits and the cost of his defense in the criminal action. On January 23, 1992, Vanguard filed a voluntary petition under Chapter 11 in the United States Bankruptcy Court for the Eastern District of New York. Bates then abandoned the arbitration demand he had filed against Vanguard but attempted to proceed with the arbitration against Asplundh. The bankruptcy court enjoined the arbitration proceeding against Asplundh. On August 12, 1993, after the Vanguard bankruptcy had been converted to a liquidation proceeding, the bankruptcy court dissolved its stay of the arbitration against Asplundh, and on November 16, 1993, the AAA notified Asplundh that pursuant to Bates' request it was proceeding with the administration of the arbitration. Asplundh then commenced the instant action on January 26, 1994.

In the court below, the district judge initially stayed the arbitration pending resolution of Asplundh's motion for a preliminary injunction. Bates moved to dismiss or in the alternative to stay the litigation and compel arbitration. After the motions were fully briefed, the district court, in an order dated March 30, 1994, granted Bates' motion to compel arbitration, denied Asplundh's motion for a preliminary injunction and dismissed the case. Asplundh filed a timely notice of appeal followed by a motion asking the district court to stay its order pending appeal. On June 8, 1994, the district court granted Asplundh's motion for a stay pending appeal. In this order, the district judge noted that her order of March 30, 1994 had failed to address the exclusionary clause to the United States Arbitration Act of 1925 ("Arbitration Act or Act") which appears in § 1 thereof, 9 U.S.C. § 1. She concluded that the exclusionary clause eliminates employment contracts from the coverage of the Act and that her previous order was in error, citing *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305 (6th Cir.1991). She invited Asplundh to dismiss its appeal and file a motion for reconsideration which she said she would grant upon filing without need for further response or hearing. Asplundh denied this invitation and continued to prosecute its appeal, and the matter is now before this court for decision on the merits.

Asplundh argues that the district court erred in three respects: (1) by failing to consider and uphold Asplundh's claim that the arbitration clause is unenforceable because it is contained in an employment agreement; (2) by failing to address and uphold Asplundh's claim that disputes based on the letter agreement are not arbitrable because the letter agreement does not contain an arbitration clause; and (3) by finding that Asplundh as a guarantor is bound by the arbitration provision contained in the second employment agreement. We will address these arguments in reverse order.

I. APPLICABILITY OF THE ARBITRATION AGREEMENT TO ASPLUNDH AS A GUARANTOR

Asplundh argues that it was a guarantor and not a party to the second employment agreement, and that as a mere guarantor, it was not bound by the arbitration clause. Asplundh, however, was more than a mere guarantor. Indeed, we conclude that it was a

party to the second employment agreement. The agreement provides that Asplundh shall have the right to make additions to, or impose limitations upon, Bates' responsibilities and privileges:

I. *EMPLOYMENT*

(a) Employer hereby employs Employee as a consultant with responsibilities, rights, and privileges as set forth herein, subject to the additions to, or limitations upon his responsibilities and privileges as may reasonably be prescribed by Employer's Board of Directors, the President of Vanguard Meter Service, Inc., or the Asplundh Tree Expert Co. Sponsor of Vanguard Meter Service, Inc. (Employment Agreement, Record p. 205).

Paragraph 1(a) of the agreement restricts Bates from seeking investments or associations during the term of the contract which would be competitive with Asplundh. Paragraph 2(a) of the agreement requires Bates to furnish consulting services and advice upon the request of Asplundh. In Paragraph 3(a), Asplundh guarantees payment of Bates' salary and benefits. In Paragraph 5(a) of the agreement, Asplundh is given the power to determine the reasonableness of reimbursable employee expenses incurred by Bates in the performance of his duties under the agreement. Paragraph 5(b) contains similar provisions regarding reimbursement for automobile expenses. The agreement concludes with this language:

IN WITNESS WHEREOF, the parties have executed this agreement, and employer has caused its corporate seal to be affixed hereto as of the day and year first hereinabove written.

Immediately beneath this language are the signatures of Bates and of Jill N. Asplundh as vice president of Vanguard and as vice president of Asplundh.

■ The arbitration clause of the second employment agreement requires arbitration of "all claims, disputes and other matters in question arising out of or relating to this agreement or the breach hereof." Section 2 of the Arbitration Act, 9 U.S.C. § 2, "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or proce-

dural policies to the contrary." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The Arbitration Act "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Id.* at 24, 25, 103 S.Ct. at 941, 941–942.

■ Bates' claim against Asplundh based upon its guarantee of the payment of his salary and benefits is a dispute "arising out of or relating to" the second employment agreement. While, as a general rule, a guarantor who is not a signatory to a contract containing an arbitration clause is not bound by the arbitration clause, *see Swensen's Ice Cream Co. v. Corsair Corp.*, 942 F.2d 1307, 1310 (8th Cir.1991); *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 539 (2d Cir.1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976), here, Asplundh was a signatory. Furthermore, the arbitration clause was not limited to Vanguard's undertakings but by its broad language included Asplundh's guarantee. The cases relied on by Asplundh are distinguishable. In *Morrie Mages & Shirlee Mages Foundation v. Thrifty Corp.*, 916 F.2d 402 (7th Cir.1990), the guarantee was a separate agreement which did not contain an arbitration clause and did not incorporate the arbitration provision of the underlying agreement. The decision in *Continental Group, Inc. v. NPS Communications, Inc.*, 873 F.2d 613 (2d Cir.1989) turned on the scope of an order issued by a state court which applied New York law, not federal law, in determining what issues should be arbitrated. The case of *In Matter of Arbitration Between Coastal Shipping, Ltd. and Southern Petroleum Tankers, Ltd.*, 812 F.Supp. 396 (S.D.N.Y.1993), did not involve the enforcement of an arbitration agreement against a guarantor but instead the issue of whether arbitration proceedings arising out of the alleged breach of the charters of two motor tankers, each covered under separate charter agreements, should be consolidated. The court held that in the absence of an express or implied agreement for consolidated arbitration, consolidation should not be ordered.

## II. APPLICABILITY OF THE ARBITRATION CLAUSE TO THE LETTER AGREEMENT

■ Although the district court did not specifically address the issue, we conclude that the arbitration clause of the second employment agreement does apply to the letter agreement. Paragraph 12(c) of the second employment agreement states:

This Agreement may not be amended, modified, extended, discharged, or terminated except by written agreement signed by the party against which or whom enforcement of such is sought.

The first sentence of the letter agreement states:

The purpose of this letter is to clarify additional items not covered by the employment agreement dated August 20, 1991.

The letter agreement may be fairly characterized as an amendment or modification of the second employment agreement. It specifically references that agreement. It contains additional provisions which are relevant to Bates' employment by Vanguard and it is signed by all of the parties, including Asplundh, as required by paragraph 12(c). Thus, the letter agreement is part of the second employment agreement which contains a valid arbitration clause. The undertakings expressed in the letter agreement are covered by that arbitration clause.

## III. THE EXCEPTION TO THE ARBITRATION ACT

■ Section 1 of the Arbitration Act, 9 U.S.C. § 1, provides as follows:

**"Maritime transactions" and "commerce" defined; exceptions to operation of title.**

"Maritime transactions", as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; "commerce", as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

In *Willis*, 948 F.2d at 311, another panel of this court said:

A review of the legislative history of the FAA confirms that the FAA was never meant to incorporate employment contracts with the requisite effects on interstate commerce within its scope.... Thus, although Congress passed the FAA to ensure that courts honor the contractual agreement of parties who choose to resolve their disputes by arbitration, (citation omitted) it limited the scope of the Act by creating a category of contracts not subject to the Act's strictures. (citation omitted) Among this category of excluded contracts are "contracts for employment." 9 U.S.C. § 1.

Relying on this pronouncement, Asplundh argues that the exclusionary clause contained in § 1 of the Arbitration Act covers all contracts of employment, and that accordingly, the arbitration clause in the second employment agreement is unenforceable. Although the district judge did not address this issue in her decision of March 30, 1994, she agreed with Asplundh in her order of June 8, 1994 when she concluded that *Willis* compelled a finding that the arbitration clause is unenforceable under § 1 of the Act.

*Willis* involved a claim of sex discrimination by a registered securities representative against her brokerage firm. The registration form she was required to file with the various national securities exchanges contained an arbitration clause which covered any dispute, claim or controversy between herself, her firm, or a customer. As noted above, the *Willis* court devoted a section of its opinion to the scope of the exclusionary clause contained in § 1 of the Act, and further concluded that it should be broadly con-

strued to extend to all contracts for employment within the scope of the commerce clause of the United States Constitution. *Willis,* 948 F.2d at 310–312. This holding was *dicta,* since the decision in *Willis* ultimately rested on a determination that the plaintiff's registration form was not an employment contract and thus not covered by the exclusionary language of § 1 of the Act. *Id.* at 312.

We are not required to follow the *dicta* of *Willis* which opines that the exclusionary clause of § 1 of the Act applies to all contracts of employment within the scope of the commerce clause. *United States v. Tucker,* 28 F.3d 1420, 1425 (6th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995); *United States v. Burroughs,* 5 F.3d 192, 194 (6th Cir.1993) ("one panel of this court is not bound by dicta in a previously published panel opinion"); *Begley v. Consolidation Coal Co.,* 826 F.2d 1512, 1517 n. 1 (6th Cir.1987) ("each of these prior cases must be considered merely dicta, not binding circuit precedent").

Since that issue is essential to the decision of the case before us, we will examine it *de novo.* We begin by observing that the scope of the exclusionary clause of the Arbitration Act was discussed but not decided in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). *Gilmer* involved a claim of age discrimination by a registered securities salesman against his employer. In order to perform the duties of his employment, Gilmer was required to register with the New York Stock Exchange (NYSE). His registration application contained an agreement to arbitrate when required by NYSE rules. NYSE rules required arbitration of any dispute arising out of the termination of a registered representative's employment. Gilmer argued that compulsory arbitration of ADEA claims would be inconsistent with the statutory framework and purposes of the ADEA. The Court rejected his arguments and held that an ADEA claim can be subjected to compulsory arbitration. *Id.,* 500 U.S. at 35, 111 S.Ct. at 1656–1657. In a dissenting opinion joined in by Justice Marshall, Justice Stevens concluded that the exclusionary clause of the Arbitration Act exempted employment contracts from the coverage of the Act. *Id.,* 500 U.S. at 40, 111 S.Ct. at 1659–1660. The majority noted the arguments of *amici curiae* that Section 1 of the Arbitration Act excluded all contracts of employment from the Act's coverage, but further observed that Gilmer did not raise this issue in the lower courts or in his petition for certiorari. *Id.,* 500 U.S. at 25 n. 2, 111 S.Ct. at 1651 n. 2. The majority also concluded that it would be inappropriate to address the scope of the exclusionary clause because the arbitration agreement was not contained in Gilmer's employment contract, and stated, "Consequently, we leave for another day the issues raised by *amici curiae.*" *Id.*

The Arbitration Act was originally enacted in 1925 and then reenacted and codified in 1947. Its purpose was "to reverse the long-standing judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer,* 500 U.S. at 24, 111 S.Ct. at 1651. As Senior Judge Peck noted in *Bacashihua v. U.S. Postal Service,* 859 F.2d 402, 404 (6th Cir.1988),

> The proper interpretation of the exclusionary provision in 9 U.S.C. § 1 has been subject to much debate. The two areas of dispute are whether collective bargaining agreements are "contracts of employment" within § 1's meaning, and whether "workers engaged in ... interstate commerce" requires that the workers personally be engaged in interstate commerce.

Judge Peck went on to observe that this court had never addressed the interpretation, nor scope, of § 1's exclusionary clause, and he apparently found it unnecessary to do so in *Bacashihua,* noting that "[i]f any class of workers is engaged in interstate commerce, it is postal workers." *Id.* at 405. Judge Peck, however, did refer to a seminal Third Circuit decision which held that the exclusionary language of § 1 applies only to workers personally engaged in interstate commerce. *See Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers of America, Local 437,* 207 F.2d 450 (3d

Cir.1953). *Tenney* and other cases of similar import were not cited by the *Willis* court.

In *Tenney*, 207 F.2d at 453, the Third Circuit noted that in 1925, when the Arbitration Act was first drafted, the concept of Congressional power over activities which affected interstate commerce had not developed to the extent to which it has since.[1] The court in *Tenney*, 207 F.2d at 452, framed its task as follows:

> Our problem, therefore, is to determine the meaning which Congress in 1925 intended to give to the phrase "workers engaged in foreign or interstate commerce". Was it intended to include only those employees actually engaged in the channels of interstate or foreign commerce or did it comprehend all those engaged in activities affecting such commerce, such as the production of goods destined for sale in it?

The court, *Id.* at 452–453, then discussed the legislative history of the exclusionary clause:

> The only reference to the clause in question appears in a report of the Bar Association committee in which it was stated:
>
> > "Objections to the bill were urged by Mr. Andrew Furuseth as representing the Seamen's Union, Mr. Furuseth taking the position that seamen's wages came within admiralty jurisdiction and should not be subject to an agreement to arbitrate. In order to eliminate this opposition, the committee consented to an amendment to Section 1 as follows: 'but nothing herein contained shall apply to contracts of employment of seamen, railroad employees or any other class of workers engaged in foreign or interstate commerce.'"

It thus appears that the draftsmen of the Act were presented with the problem of exempting seamen's contracts. Seamen constitute a class of workers as to whom Congress had long provided machinery for arbitration. (footnote omitted) In exempting them the draftsmen excluded also railroad employees, another class of workers as to whom special procedure for the adjustment of disputes had previously been provided. (footnote omitted) Both these classes of workers were engaged directly in interstate or foreign commerce. To these the draftsmen of the Act added "any other class of workers engaged in foreign or interstate commerce." We think that the intent of the latter language was, under the rule of ejusdem generis, to include only those other classes of workers who are likewise engaged directly in commerce, that is, only those other classes of workers who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it. The draftsmen had in mind the two groups of transportation workers as to which special arbitration legislation already existed and they rounded out the exclusionary clause by excluding all other similar classes of workers.

We find this analysis persuasive.

Three years later, the Second Circuit followed *Tenney* in *Signal–Stat Corporation v. Local 475, United Electrical Radio & Machine Workers of America*, 235 F.2d 298, 302–303 (2d Cir.1956), *cert. denied*, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957):

> We incline to agree with the decision and reasoning of the Third Circuit in the *Tenney* case. This conclusion is consonant with our decisions. Although this court has never passed on the precise issue here involved, we did, in *Shirley–Herman Co. v. International Hod Carriers, Bldg. & Com-*

---

1. As demonstrated by Justice Thomas' scholarly analysis of this issue in his concurring opinion in *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), at the time the Constitution was ratified "commerce" meant selling, buying and bartering in contradistinction to productive activities such as manufacturing and agriculture, and the concept that congressional power extends to all matters substantially affecting commerce is not supported by any decision of the Supreme Court prior to the New Deal. Justice Thomas noted that as late as 1921, the Court said in *Newberry v. United States*, 256 U.S. 232, 257, 41 S.Ct. 469, 474, 65 L.Ed. 913 (1921):

> "It is settled ... that the power to regulate interstate and foreign commerce does not reach whatever is essential thereto. Without agriculture, manufacturing, mining, etc., commerce could not exist, but this fact does not suffice to subject them to the control of Congress."

*mon Laborers Union,* 2 Cir., 182 F.2d 806, 809, impliedly hold that a collective bargaining agreement constituted a "contract of employment"; and in *Bernhardt v. Polygraphic Co. of America,* 2 Cir., 218 F.2d 948, 951–952, reversed on other grounds 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199, we gave a restrictive interpretation to the term, "workers" as used in the exclusionary clause in Section 1.

\* \* \*

... [W]e think the courts should interpret the United States Arbitration Act so as to further, rather than impede, arbitration in this area. We think the interpretation of the Third Circuit in *Tenney* accords both with the modern trend and with what we deem to be the intention of Congress.

In *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1069 (2d Cir.1972), the Second Circuit reaffirmed its decision in *Signal–Stat,* noting that "[i]n light of the strong national policy in favor of arbitration as a means of settling private disputes we see no reason to give an expansive interpretation to the exclusionary language of Section 1 by reexamining our decision in *Signal–Stat, supra.*"

In 1965, the Seventh Circuit followed suit in *Pietro Scalzitti Co. v. International Union of Operating Engineers, Local No. 150,* 351 F.2d 576, 580 (7th Cir.1965)("We agree with the Second Circuit that this interpretation 'accords both with the modern trend and with what we deem to be the intention of Congress.' "). The Seventh Circuit recently reaffirmed its position in *Miller Brewing Co. v. Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1162 (7th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985), holding that § 1 was inapplicable in that case, and noting that § 1 "has been held to be limited to workers employed in the transportation industries."

The First Circuit reached the same conclusion in *Dickstein v. duPont,* 443 F.2d 783, 785 (1st Cir.1971):

Equally unavailing is appellant's argument that he was a worker "engaged in foreign or interstate commerce" within the exceptions to the Arbitration Act set out in section 1. 9 U.S.C. § 1. Courts have generally limited this exception to employees, unlike appellant, involved in, or closely related to, the actual movement of goods in interstate commerce. [Citing *Tenney Engineering, Inc.* and *Signal–Stat* ].

*Dickstein* was cited with approval by this court in *Stokes v. Merrill Lynch, Pierce, Fenner & Smith,* 523 F.2d 433, 436 (6th Cir.1975):

Appellants have stipulated that their claims arise directly from their employment with Merrill Lynch in interstate commerce. They do not seriously contend that as "account executives", they fall within the exception from coverage in § 1 of the Arbitration Act for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce". Cf. *Dickstein v. duPont,* 443 F.2d 783, 785 (1st Cir.1971).

With one exception, every circuit court which has addressed this question since *Tenney* has held that the exclusionary clause of § 1 of the Act should be narrowly construed. The exception is the Fourth Circuit's decision in *United Electrical, Radio & Machine Workers v. Miller Metal Products, Inc.,* 215 F.2d 221, 224 (4th Cir.1954). The Fourth Circuit in *Miller Metal Products,* 215 F.2d at 224, disagreed with the position taken by the Third Circuit, stating:

Nor are we impressed by the argument that the excepting clause of the statute should be construed as not applying to employees engaged in the production of goods for interstate commerce as distinguished from workers engaged in transportation in interstate commerce, as held by the majority in *Tenney Engineering, Inc. v. United Electrical Radio & Mach. Workers,* 3 Cir., 207 F.2d 450.

However, the court, *Id.,* went on to expressly limit its holding to the issue of the applicability of the Arbitration Act to collective bargaining agreements:

[W]e do not decide that workers and employers may not agree to arbitrate their differences. Nor do we decide that such agreements to arbitrate may not be specif-

ically enforced. (citations omitted) What we decide, and all we decide, is that the arbitration clause in the collective bargaining agreement here does not cover the matter of damages arising out of violation of the no-strike clause and that the provisions of the United States Arbitration Act may not be relied on to stay proceedings in a suit brought on a collective bargaining agreement entered into by workers engaged in interstate commerce as those here were engaged.

It is questionable whether *Miller Metal Products* is still good law even in the Fourth Circuit. One district court in the Fourth Circuit declined to follow it in *Kropfelder v. Snap–On Tools Corp.*, 859 F.Supp. 952, 958 (D.Md.1994), stating:

> In light of the time which has passed since the *Miller Metal* decision, (footnote omitted) the strong federal policy in favor of arbitration, and the great weight of circuit court authority, this Court is of the view that the Fourth Circuit would not, as of this date, apply the words used in *Miller Metal* so as to exclude § 1's application in all non-collective bargaining contexts, and would instead apply the views expressed by a majority of the courts that as to non-collective bargaining contracts the FAA excludes only those workers involved in the interstate transportation of goods.

Another in-depth analysis of § 1 of the Act can be found in *DiCrisci v. Lyndon Guaranty Bank*, 807 F.Supp. 947, 953 (W.D.N.Y. 1992):

> An analysis of the Act also supports the conclusion that § 1 refers to actual interstate commerce. Although at first glance it might seem likely that Congress would have intended "commerce" to have the same meaning throughout the Act, the reference to "workers engaged in foreign or interstate commerce" in § 1 would be surplusage if it were simply coextensive with Congress's powers under the commerce clause. Under [*Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) ], § 2 gives the Act as a whole the same reach as Congress's commerce clause power. Therefore, if Congress had wanted to excluded [sic] *all* employment contracts

from the Act, it could simply have said "employment contracts" and left it at that. Any workers beyond the reach of the commerce clause would not be covered by the Act in the first place. The language of § 1 also reinforces this view; the reference to "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," suggests that Congress intended to refer to workers engaged in commerce *in the same way* that seamen and railroad workers are. (emphasis in the original)

District court decisions which follow *Tenney, Signal–Stat, Pietro Scalzitti, Dickstein* and *Erving* and adopt a narrow construction of the exclusionary clause of § 1 of the FAA include: *Albert v. National Cash Register Co.*, 874 F.Supp. 1324, 1326–1327 (S.D.Fla. 1994) (expressly declining to following *Willis*, noting "It is quite impossible to apply a broad meaning to the term 'commerce' in Section 1 and not rob the rest of the exclusion clause of all significance."); *Cherry v. Wertheim Schroder & Co.*, 868 F.Supp. 830, 834–835 (D.S.C.1994); *Crawford v. West Jersey Health Systems*, 847 F.Supp. 1232, 1240–1242 (D.N.J.1994)(expressly declining to follow *Willis*, finding its reasoning "less compelling" than Judge Larrimer's statutory analysis in *DiCrisci* ); *Scott v. Farm Family Life Ins. Co.*, 827 F.Supp. 76, 77–79 (D.Mass. 1993); *Hull v. NCR Corp.*, 826 F.Supp. 303, 307 (E.D.Mo.1993)(declining to follow *Miller Metal Products* and noting that its holding pertained only to an arbitration clause in a collective bargaining agreement); *In Matter of Arbitration Under Agreements Between Management Recruiters Int'l, Inc. and Nebel*, 765 F.Supp. 419, 421–422 (N.D.Ohio 1991). *But see Arce v. Cotton Club of Greenville, Inc.*, 883 F.Supp. 117, 118–123 (N.D.Miss.1995) ("[T]his court does not follow the line of cases interpreting the exclusion clause of 9 U.S.C. § 1 to apply only to those class of employees actually engaged in the movement of goods in foreign or interstate commerce.").

■ We conclude that the exclusionary clause of § 1 of the Arbitration Act should be narrowly construed to apply to employment contracts of seamen, railroad workers, and

any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are. We believe this interpretation comports with the actual language of the statute and the apparent intent of the Congress which enacted it. The meaning of the phrase "workers engaged in foreign or interstate commerce" is illustrated by the context in which it is used, particularly the two specific examples given, seamen and railroad employees, those being two classes of employees engaged in the movement of goods in commerce.

Furthermore, there is an obvious difference between the wording of § 2 of the Act, which defines what the Act covers, and the exclusionary clause of § 1. Section 2 extends the coverage of the Act to "any maritime transaction or a contract evidencing a transaction involving commerce." [2] The exclusionary clause does not employ the same broad language of § 2. If Congress had intended the exclusion to be as broad as the coverage, it would have used the same language in the exclusion clause.

The legislative history of the Act cited in *Tenney Engineering* indicates that the exclusionary clause was added to overcome the objection of the seamen's union. Justice Stevens in his dissent in *Gilmer* cites additional legislative history, 500 U.S. at 39, 111 S.Ct. at 1659. It does not, however, persuade us that Congress intended the exclusionary clause to apply to all contracts of employment. The comment of the chairman of the American Bar Association committee responsible for drafting the bill to the effect that the bill "is not intended [to] be an act referring to labor disputes, at all" would tend to support the contention that the Act was not intended to apply to collective bargaining agreements, but sheds no further light on the issue of individual employment contracts. The comments of Senator Walsh quoted by Justice Stevens in *Gilmer* reflect on objections to the enforcement of arbitration agreements in general on the ground that they are often contracts of adhesion. Congress rejected Senator Walsh's arguments when it passed the Act.[3]

Finally, we believe a narrow construction of the exclusionary clause is consistent with the underlying purpose of the Act, which is to favor arbitration. The history of the treatment of the Arbitration Act in the Supreme Court of the United States reflects a clear disposition to liberalize and expand its application. *See, Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984)("In enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration."); *Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. at 941 ("Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements[.]"); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967)("[W]e not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to

---

2. The failure to limit this federal statute to transactions involving interstate commerce is probably explained by the fact that one of the powers Congress exercised in 1925 was the pre-*Erie* power to prescribe general law applicable in all federal courts. *See, Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See also, Southland Corp. v. Keating,* 465 U.S. 1, 21–36, 104 S.Ct. 852, 863–871, 79 L.Ed.2d 1 (1984) (O'Conner, J. dissenting).

3. Senator Walsh's questions in the hearing of January 31, 1923 reflect his understanding that the literal language of the Act would cover individual employment contracts, insurance contracts, building contracts and shipping contracts, not just commercial disputes between merchants. Senator Walsh seemed to suggest that, in order to overcome his objections, the proposed Act should be amended to cover only commercial disputes between merchants—the kind of disputes described by the subcommittee's first witness, Mr. Bernheimer—as illustrated by the senator's comment: "Mr. Piatt, perhaps you could think of some way by which that objection could be obviated. I really believe that in the class of cases that Mr. Bernheimer has in mind, it would be a very useful thing, and I would be disposed to favor it[.]" Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 11 (1923). Of course, no such amendment was made.

delay and obstruction in the courts."). Viewed in the light of this liberal and expansive interpretation of the coverage of the Arbitration Act, a narrow construction of the exclusionary clause would seem more logical and consistent with the national policy the Supreme Court has attributed to the Act.

Here, the arbitration clause is contained in an employment contract between a highly paid executive and his corporate employer. The parties included in their bargain an agreement that any disputes would be resolved by arbitration. We conclude that this agreement is enforceable under the Arbitration Act. In accordance with the foregoing, we AFFIRM the district court's order of March 30, 1994 granting defendant-appellee's motion to compel arbitration and denying plaintiff-appellant's motion for a preliminary injunction and dismissing the case.

Judgment AFFIRMED.