Anthony I. CRAFT, Plaintiff–Appellee,

v.

**CAMPBELL SOUP COMPANY,
a Corporation, Defendant–
Appellant.**

No. 98–15060.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 1998.

Decided Dec. 2, 1998.

**1200**

Steven B. Berlin, Littler Mendelson, San Francisco, California, for defendant-appellant.

John E. Linneball, Ross & Associates, San Francisco, California, for plaintiff-appellee.

Before: BRUNETTI, TASHIMA, and GRABER, Circuit Judges.

Per Curiam Opinion; Dissent by Judge BRUNETTI.

**PER CURIAM:**

We must decide the threshold issue of whether we have jurisdiction to hear Campbell Soup Company's ("Campbell Soup") interlocutory appeal from the district court's denial of its motion for summary judgment. Because we conclude that appellate jurisdiction is lacking, we dismiss the appeal.

As there is no final judgment or any other applicable exception to the final judgment rule, this court has jurisdiction only if the Federal Arbitration Act ("FAA") applies. *See* 9 U.S.C. § 16 (providing for interlocutory appeal under the FAA). Our jurisdiction therefore hinges on the proper interpretation of the FAA in relation to employment contracts, which is a question of first impression in our circuit. *See Kummetz v. Tech Mold, Inc.*, 152 F.3d 1153, 1155 n. 2 (9th Cir.1998) ("Whether § 1 of the FAA broadly excludes arbitration agreements within contracts of employment is an open question in this circuit.") (citing *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 759 n. 4 (9th Cir. 1997)).

**I.**

Anthony I. Craft was an employee of Campbell Soup and a member of the Food Process Workers and Warehousemen and Helpers Local Union 228 (the "Union"). The collective bargaining agreement ("CBA") between Campbell Soup and the Union includes a nondiscrimination clause which provides that "[d]isputes under this provision shall be subject to the grievance and arbitration procedure [provided in the CBA]." [1]

Craft filed a grievance alleging racial discrimination, harassment, health and safety concerns, and other claims. The grievance was not resolved in the initial grievance stages and the Union referred it to arbitration. While the grievance was still pending, Craft filed this action in district court. He alleged claims for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and state law claims for assault and emotional distress.[2]

---

1. The nondiscrimination clause provides:
    The Company and the Union do not and will not discriminate against employees because of race, color, religion, sex, age, or national origin. The Company offers equal employment, transfer and promotional opportunities regardless of race, color, religion, sex, age or national origin. All employment practices are to be conducted in a nondiscriminatory manner, all hiring, promotion practices, and other terms or conditions of employment shall be maintained and conducted in a manner which does not discriminate on the basis of race, color, sex, religion, national origin, handicap or service in the Armed Forces in accordance with applicable Federal and State laws. Disputes under this provision shall be subject to the grievance and arbitration procedure.
    CBA, ¶ 26.1.

2. At the arbitration, the arbitrator was concerned about the parallel judicial and arbitral proceedings and correctly noted a circuit split on his authority to resolve Craft's race discrimination claims. Ultimately, the arbitrator decided that Craft's claims under the CBA were so intertwined that the Union had to submit the entire grievance to arbitration or withdraw it.

The district court granted Campbell Soup summary judgment on Craft's supplemental state law claims. Following the majority view, however, the court held that arbitration of Craft's Title VII claims could not be compelled.[3] Accordingly, it denied Campbell Soup's summary judgment motion as to those claims. Campbell Soup appeals that interlocutory order denying its motion for summary judgment on Craft's Title VII claims.[4]

## II.

"When interpreting a statute, this court looks first to the words that Congress used." *Sanchez v. Pacific Powder Co.,* 147 F.3d 1097, 1099 (9th Cir.1998). "Rather than focusing just on the word or phrase at issue, this court looks to the entire statute to determine Congressional intent." *Id.*

Applying those principles here, we begin with § 2 of the FAA, which provides for the enforcement of certain arbitration provisions:

> A written provision in any *maritime transaction or a contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

A collective bargaining agreement or an individual employment contract would not seem to fall within the ordinary concept of a contract "evidencing a *transaction,*" even though it often involves interstate commerce. As pertinent, "transaction" commonly means "[a] business deal; an act involving buying and selling." Webster's Int'l Dictionary 2688

(2d ed. unabridged 1939). *See* The Century Dictionary and Cyclopedia 6426 (revised and enlarged ed.1911) ("1. The management or settlement of an affair; a doing or performing: as, the *transaction* of business. –2. A completed or settled matter or item of business ....."); *see also United States v. Boos,* 127 F.3d 1207, 1210 (9th Cir.1997) (generally, words in a statute are given their common and ordinary definition), *cert. denied,* —— U.S. ——, 118 S.Ct. 734, 139 L.Ed.2d 672 (1998). In summary, the coverage section of the FAA, § 2, appears not to encompass employment contracts at all.

Section 1 of the FAA, however, contains definitions and, with respect to "commerce," concludes that "nothing herein shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. This latter provision suggests that Congress intended for § 2 to apply to some collective bargaining agreements and employment contracts. Viewed as a whole, the statute is ambiguous.

Courts have developed two interpretations of these ambiguous provisions: (1) Congress did not intend for the FAA to apply to any employment contracts; and (2) Congress intended for the FAA to apply to all employment contracts, except for the contracts of employees who actually work in interstate commerce. Craft does not actually work in interstate commerce. Thus, if the latter view applies, the FAA governs this action, and we have jurisdiction to decide this appeal. If, on the other hand, the FAA does not apply to employment contracts, then the FAA's interlocutory appeal provision, 9 U.S.C. § 16(a)(1)(B), would not give us jurisdiction to decide this appeal.

Courts that have adopted the latter view have relied on a contemporary understanding

---

3. *See Doyle v. Raley's, Inc.,* 158 F.3d 1012, 1015 n. 3 (9th Cir.1998) (gathering cases and noting circuit split). In *Wright v. Universal Maritime Serv. Corp.,* —— U.S. ——, 119 S.Ct. 391, —— L.Ed.2d —— (1998), the Supreme Court declined to consider the applicability of the FAA in a case which presented "the question whether a general arbitration clause in a collective-bargaining agreement (CBA) requires an employee to use the arbitration procedure for an alleged violation of the Americans with Disabilities Act of

1990(ADA), 104 Stat. 327, 42 U.S.C. § 12101 et seq." *Id.* at 392–93, 395 n. 1.

4. Both parties assume that Campbell Soup's motion for summary judgment was a *de facto* petition under 9 U.S.C. § 4 for an order to compel arbitration. Although Campbell Soup's motion does not mention this section, we agree that it was functionally equivalent to a motion to compel arbitration.

of the terms used in the FAA.[5] The FAA, however, is not a modern statute. The FAA, including § 1, was enacted in 1925, before the Supreme Court dramatically expanded the meaning of interstate commerce in the 1930s.

Thus, to understand Congress' intent in enacting the FAA and the employment exclusion clause, we need to understand the meaning of the phrase "engaged in ... interstate commerce," as Congress understood the phrase in 1925. Before Congress enacted the FAA, the Supreme Court decided *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), *overruled by United States v. Darby,* 312 U.S. 100, 117, 61 S.Ct. 451, 85 L.Ed. 609 (1941). In *Hammer,* the Court invalidated a federal child labor law, holding that Congress' commerce power did not extend to intrastate employees whose work involved interstate commerce. *Hammer* defined the scope of the commerce clause as quite limited:

> Commerce consists of intercourse and traffic ... and includes the transportation of persons and property, as well as the purchase, sale and exchange of commodities. The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof. Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation.

*Id.* at 272, 38 S.Ct. 529 (quotations omitted). Similarly, in *Howard v. Illinois Cent. R.R.,* 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297 (1908)(the first employer liability case), workers not directly involved in interstate commerce were deemed outside of Congress' Commerce Clause power. *Howard* rejected the idea that "one who engages in interstate commerce thereby submits all of his business concerns to the regulating power of Congress," *id.* at 502, 28 S.Ct. 141, and held the employer liability act unconstitutional, because it included subjects outside of Congress' constitutional power to regulate. *Id.* at 504, 28 S.Ct. 141.

This narrow understanding of Congress' Commerce Clause power continued through the period of the drafting and enacting of the FAA. In *United Leather Workes' Int'l Union v. Herkert & Meisel Trunk Co.,* 265 U.S. 457, 464, 44 S.Ct. 623, 68 L.Ed. 1104 (1924), the Court held that an illegal strike of leather workers preventing the manufacture of goods did not interfere with interstate commerce, as it did not interfere with the "free transport and delivery of the products." Congress' Commerce Clause power at the time of the FAA's enactment was clearly limited to the actual interstate movement of goods. Thus, an act promulgated in the mid–1920s, which excluded workers "engaged in interstate commerce," extended its reach to the outer limit of Congress' power under the Commerce Clause, because all classes of employees who were not actually working in interstate commerce were already outside the reach of the FAA. Because Congress drafted the employment exclusion clause to exclude all employment contracts which it then had the power to regulate, Congress clearly intended that the FAA *not* apply to *any* contracts of employment.

---

5. The majority of circuits have interpreted the FAA to apply to all employment contracts, except for the contracts of employees who actually work in interstate commerce. *McWilliams v. Logicon, Inc.,* 143 F.3d 573, 576 (10th Cir.1998)(ignoring conflicting precedent in *United Food Workers, Local Union No. 7R v. Safeway Stores, Inc.,* 889 F.2d 940, 943–44 (10th Cir.1989)); *O'Neil v. Hilton Head Hosp.,* 115 F.3d 272, 274 (4th Cir.1997)(ignoring conflicting precedent in *Domino Sugar Corp. v. Sugar Workers Local Union 392,* 10 F.3d 1064, 1067–68 (4th Cir.1993)); *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 358 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 295, 139 L.Ed.2d 227 (1997); *Cole v. Burns Int'l Sec. Serv.,* 105 F.3d 1465, 1470–72 (D.C.Cir.

1997); *Rojas v. TK Communications, Inc.,* 87 F.3d 745, 747–48 (5th Cir.1996); *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 596–601 (6th Cir.1995); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1069 (2d Cir.1972); *Dickstein v. duPont,* 443 F.2d 783, 785 (1st Cir.1971); *Tenney Eng'g, Inc. v. United Elec. Workers, Local 437,* 207 F.2d 450, 452–53 (3d Cir.1953). A few courts, however, have interpreted the exclusion broadly. *Domino Sugar Corp.,* 10 F.3d at 1067–68; *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1120 (3d Cir.1993) (ignoring conflicting Third Circuit precedent in *Tenney* ); *United Food Workers,* 889 F.2d at 943–44.

From a historical context, then, § 1 was clearly intended to exempt *all* employment contracts over which Congress had interstate commerce power.

The legislative history of the FAA also indicates that the Act's purpose was solely to bind merchants who were involved in commercial dealings. *See Local 205, United Elec. Workers v. General Elec. Co.*, 233 F.2d 85, 99 (1st Cir.1956) (noting that congressional attention was being directed solely toward the field of commercial arbitration), *aff'd on other grounds*, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957). Before the Senate Judiciary Committee held hearings on the FAA, the draft bill made valid and enforceable "a written provision in *any contract or maritime transaction or* transaction involving commerce to settle by arbitration a controversy thereafter arising." [6] *See Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration, Hearing on S. 4213 and S. 4214 before a Subcomm. of the Senate Comm. on the Judiciary*, 67th Cong. 1 (1923) (emphasis added) ("67th Cong."). *See also Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 279, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (citing the original wording of the FAA). That draft of the bill thus applied to all contracts and did not contain the employment exclusion later codified in § 1.

At the hearing, the chair of the American Bar Association Committee on Commerce, Trade and Commercial Law, W.H.H. Piatt, testified that the bill was partly in reaction to the intense judicial hostility toward arbitration of merchants' disputes. 67th Cong. at 8 (1923)(statement of W.H.H. Piatt).[7] Piatt went on to state that the FAA was not to "be an act referring to labor disputes *at all*. It is purely an act to give the merchants the right or privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now that is all there is in this." *Id.* at 9 (emphasis added). When questioned by Senator Walsh about workers forced to arbitrate their grievances unwillingly as a result of their labor or employment contracts, Piatt went out of his way to state that he "would not favor any kind of legislation that would permit the forcing a man to sign that kind of contract.... [I]t is the primary end of this contract [sic: bill] that it is a contract between merchants one with another, buying and selling goods." *Id.* at 10.

Before that same committee, the Secretary of Commerce, Herbert Hoover, suggested that, if Congress wanted to ensure that "workers' contracts" were excluded from the FAA, "it [the bill that became the FAA] might well be amended by stating that 'but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce.'" *Id.* at 14. Thereafter, Congress amended what became § 2 of the FAA so that it applied only to "contracts evidencing a transaction" (not to all contracts) and added the employment exclusion clause that the Secretary of Commerce suggested.

As can be seen from the Senate Judiciary Committee hearing, and the subsequent amendments that Congress made to the proposed legislation, the FAA was part of an effort to gain uniformity in the application of agreements to arbitrate sales and commercial transactions. The FAA was never intended to apply to labor contracts of any sort. Labor contracts were seen as having the potential to elicit the forced agreement to arbitrate that the enactors of the FAA so disliked.

The interpretation of the FAA has remained confused, however, because many courts have ignored the "transaction" re-

---

**6.** Section 2 of that draft bill provided in full:

That a written provision in any contract or maritime transaction or transaction involving commerce to settle by arbitration a controversy thereafter arising between the parties out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.
S. 4214, 67th Cong. § 2 (1922).

**7.** The bill that became the FAA was drafted by the ABA Committee on Commerce, Trade and Commercial Law. *See Tenney*, 207 F.2d at 452 & n. 5 (citing H.R.Rep. No. 96, 68th Cong., 1st Sess., p. 1).

quirement of § 2 and have provided anachronistic "explanations" in support of their conclusions that § 1 should be applied only to those workers directly involved in interstate commerce.

One such explanation, cited by Campbell Soup, was provided by the Third Circuit in *Tenney*, which concluded that the Act excluded only those workers for whom there already was special arbitration. *See Tenney*, 207 F.2d at 452–53. As Professor Matthew Finkin has argued, however, "the court reasoned backwards and got it wrong." *See* Matthew W. Finkin, *Worker's Contracts Under the United States Arbitration Act: An Essay in Historical Clarification*, 17 Berk. J. Emp. & Lab. L. 282, 291 (1996) ("*Finkin*"). Congress' intent in drafting the § 1 exclusion could not have been to exclude only those who already had existing arbitration procedures available, as there was *no* alternative arbitration system for transportation workers at the time. *Id.* Only seamen and railroad workers had arbitration alternatives and, if Congress wanted to limit the exclusion clause to these groups, it would have done so explicitly. Transportation workers were a large and important part of interstate commerce during the early 1920s and unquestionably a critical subject of Congress' interstate commerce power. Further, the visibility of these enterprises politically was increased by the legal contest over their regulatory status at the time. *See id.* The exclusion of these workers could not be justified by an alternate arbitration system. The fact that the FAA's drafters included transportation workers in § 1 should signal to modern-day interpreters that Congress wished the exclusion to reach to the full extent of its commerce power.

Campbell Soup also relies on the textual argument from *Cole* and a similar case from the Sixth Circuit, *Asplundh*, to maintain that the use of the term "engaged in" interstate commerce in § 1 points to a much narrower construction than the use of the word "involving" commerce, found in § 2 of the FAA. *Cole*, 105 F.3d at 1471 *Asplundh*, 71 F.3d at 599. To arrive at this distinction, these cases rely on *Terminix*, 513 U.S. at 273–74, 115 S.Ct. 834, which held that the term "involving" is as broad as the term "affecting" commerce (*i.e.*, expresses the full reach of the

Commerce Clause). Thus, both *Cole* and *Asplundh* argue that, while the term "involving" interstate commerce dictates Congress' full reach of the Commerce Clause, the phrase "engaged in .... interstate commerce," as used in § 1, has a narrower meaning, reaching only those workers directly involved in transporting commerce. *See Cole*, 105 F.3d at 1471–72; *Asplundh*, 71 F.3d at 598.

As Professor Finkin points out, however:

> The difficulty [with this interpretation] is that the distinction has no support in either the law of the period or the history of the Act. On the law, there is no doubt that by the 1940's the Supreme Court had expanded the Commerce power to reach a class of workers who "affected" commerce even though they were not engaged in it; but it is dubious, at the very least, that that distinction was well recognized in 1924.

*Finkin* at 294. Moreover, as Finkin additionally notes, courts that have made these kinds of textual distinctions, like *Tenney* and *Asplundh*, have relied entirely on cases from the 1940s to support the distinction between "engaged in" and "involving" commerce. *See Finkin* at 294 n. 55. We decline to adopt such anachronistic reasoning.

Campbell also relies on the rule of ejusdem generis to interpret narrowly the employment exclusion. The rule of ejusdem generis "limits general terms which follow specific ones to matters similar to those specified." *Cole*, 105 F.3d at 1471. Accordingly, the general phrase "any other class of workers engaged in foreign or interstate commerce" in the exclusion clause takes its meaning from the specific terms preceding it—"seamen" and "railroad employees"—and includes only those other classes of workers who are similarly engaged directly in commerce. *Id.*

This line of reasoning, however, is inapplicable to § 1. As the dissent in *Tenney* convincingly argues:

> Since the intention of Congress manifestly was to confine the Act to commercial disputes, ejusdem generis has no possible relevancy here. As said in *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 80

L.Ed. 522, it (the rule of ejusdem generis) may not be used to defeat the obvious purpose of legislation.

*Tenney,* 207 F.2d at 458 (McLaughlin, J., dissenting) (internal quotations and citations omitted). Both the legislative history and the contemporary meaning of the Commerce Clause at the time of the FAA's enactment demonstrate the obvious scope and purpose of the FAA, which ejusdem generis cannot be used to defeat. Moreover, we reiterate that the cases on which Campbell Soup relies address § 1 without taking a step back and considering the context in which § 1 appears: Section 2's requirement that a contract involve a "transaction" to be included in the scope of the FAA in the first instance.

While neither this court nor the Supreme Court has definitively ruled on whether the FAA applies to employment contracts, both courts have suggested that it does not. We have repeatedly noted the Supreme Court's reluctance to hold the FAA applicable to arbitration proceedings involving labor disputes, as well as our own inclination to interpret the employment exclusion clause broadly. *See American Postal Workers Union v. United States Postal Serv.,* 861 F.2d 211, 215 n. 2 (9th Cir.1988) (noting that neither Supreme Court nor this court has ever expressly held FAA applicable to arbitration of labor disputes); *San Diego County Dist. Council of Carpenters v. Cory,* 685 F.2d 1137 (9th Cir.1982) (indicating that Congress did not mean FAA to be used to review arbitration awards involving collective bargaining agreements); *Local 1020, United Brotherhood of Carpenters v. FMC Corp.,* 658 F.2d 1285, 1290 (9th Cir.1981)(noting the Court's hesitation to hold FAA enforceable in labor arbitration proceedings and discussing Justice Frankfurter's dissent in *Lincoln Mills* ). As we have noted earlier, however, the question is still an open one in this circuit. *See Kummetz,* 152 F.3d at 1155 n. 2 (so stating).

From time to time also, there have been indications from the Supreme Court, albeit no more than indications, that the FAA does not apply to employment contracts. In both *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and *General Elec. Co. v. United Elec. Workers,* 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028 (1957), although the Court enforced the arbitration agreements at issue, it did so under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), and not under the FAA. *See Lincoln Mills,* 353 U.S. at 456, 77 S.Ct. 912; *General Elec.,* 353 U.S. at 548, 77 S.Ct. 921. In dissent, Justice Frankfurter highlighted the importance of that distinction:

> Naturally enough, I find rejection, though not explicit, of the availability of the Federal Arbitration Act to enforce arbitration clauses in collective-bargaining agreements in the silent treatment given that Act by the Court's opinion. If an Act that authorizes the federal courts to enforce arbitration provisions in contracts generally, but specifically denies authority to decree that remedy for "contracts of employment," were available, the Court would hardly have to spin such power out of the empty darkness of § 301. I would make this rejection explicit, recognizing that when Congress passed legislation to enable arbitration agreements to be enforced by the federal courts, it saw fit to exclude this remedy with respect to labor contracts.

*Lincoln Mills,* 353 U.S. at 466–67, 77 S.Ct. 912 (Frankfurter, J., dissenting) (citations omitted).

More recently, in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Court faced an arbitration clause in a New York Stock Exchange securities form. Although the Court declined to address the scope of the § 1 exclusion, because the securities agreement was not an employment contract, *see id.* at 25 n. 2, 111 S.Ct. 1647, the dissent noted that the legislative history of the FAA demonstrated that it does not apply to employment contracts at all. *See id.* at 39–40, 111 S.Ct. 1647 (Stevens, J., dissenting)("[T]he FAA specifically was intended to exclude arbitration agreements between employees and employers.").

Finally, and notwithstanding its broad reading of the term "involving commerce" in § 2, *Terminix,* 513 U.S. at 273–75, 115 S.Ct. 834, does not support the majority view. While those courts interpret the word "commerce" broadly in § 2, they construe the same word narrowly in § 1's employment

exclusion clause. *See Asplundh,* 71 F.3d at 601 (finding an "obvious difference" between wording of § 1 and § 2 of the Act); *Cole,* 105 F.3d at 1472 (arguing that *Terminix* limits scope of employment exclusion in § 1). Yet, at the time of the FAA's enactment, the modern dichotomy between the terms "involving commerce" and "in commerce" did not exist. Instead, the terms were used interchangeably. Thus, if those courts interpret § 2 ("involving commerce") as reaching the limits of Congress' current Commerce Clause powers, they must also give the employment exclusion clause in § 1 a similar scope. Only a consistent interpretation of these similar terms in both sections is consistent with the purposes of the FAA.

■ Based on the wording of § 2, the pre-New Deal understanding of the Commerce Clause, the legislative history of the FAA, and the suggestions gleaned from *Lincoln Mills, Gilmer,* and *Terminix,* we hold that the FAA does not apply to labor or employment contracts. Thus, the FAA is inapplicable to the CBA that governs Craft's employment. Accordingly, we have no jurisdiction over Campbell Soup's interlocutory appeal and this appeal is hereby

**DISMISSED.**

BRUNETTI, Circuit Judge, Dissenting.

Today, the majority goes against the great weight of circuit court authority [1] by holding that exclusionary clause of § 1 of the Federal Arbitration Act ("FAA") applies to all contracts of employment within the scope of the Commerce Clause and that we therefore lack jurisdiction to hear this interlocutory appeal. Because I find that the plain language of statute dictates a contrary result, I respectfully dissent.

The majority avers that, when sections 1 and 2 of the FAA are read together, the term "engaged in interstate commerce" is ambiguous. To resolve this perceived ambiguity, it examines the historical context and legislative history of the FAA. From these extrinsic sources, the majority determines that Congress clearly intended to exclude all employment contracts from the ambit of the Act and

that therefore the traditional rules of statutory interpretation are inapplicable because their use would frustrate obvious Congressional intent. In contrast to the majority's approach to statutory interpretation, I believe that we have an obligation to first analyze the text and structure of the FAA before turning to extrinsic material. Only if these inquiries prove unhelpful in discerning Congressional intent should we engage in the majorities' rather complex exercise in statutory interpretation. *See, e.g., Shannon v. United States,* 512 U.S. 573, 584, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994); *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *United States v. Taylor,* 487 U.S. 326, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring in part).

The plain language of the exclusionary clause states that the Act does not "apply to contracts of employment of seamen, railroad employees, or any other class of worker engaged in foreign or interstate commerce." 9 U.S.C. § 1 (1994). A natural reading of this language indicates that Congress intended to exclude three specific types of employment contracts from the scope of the FAA. If one reads, as the majority does, the final phrase- "any other class of workers engaged in foreign or interstate commerce"-to exclude all contracts of employment then the specific pronouncements that seamen and railroad workers' employment contracts do not fall within the purview of the Act are drained of all meaning. *See Rojas v. TK Communications, Inc.,* 87 F.3d 745, 748 (5th Cir.1996) ("[i]t is quite impossible to apply a broad meaning to the term 'commerce' in Section 1 and not rob the rest of the exclusionary clause of all significance") (internal citations omitted); *Cole v. Burns International Security Services,* 105 F.3d 1465, 1470–71 (D.C.Cir.1997).

The "cardinal principal of statutory construction" instructs that a court has a "duty to give effect, if possible, to every clause and word of a statute." *Bennett v. Spear,* 520 U.S. 154, 173, 117 S.Ct. 1154, 137 L.Ed.2d

---

1. As the majority concedes, almost every circuit to have considered this question directly has held that the employment exclusion clause of § 1

should be interpreted narrowly. *See* Majority Opinion, at 1202 n. 5.

281 (1997) (internal citations omitted). Here, we can fulfill this duty by concluding that the phrase "workers engaged in interstate commerce" refers only to those workers who are themselves engaged in the movement of goods in interstate commerce. Congress with ease could have drafted § 1 to read "nothing herein shall apply to contracts of employment." *Cole,* 105 F.3d at 1471. This, however, is not the language Congress enacted into law and I would decline to say that Congress included the words "seamen" and "railroad employees" for no purpose.

As the majority notes, the rule of ejusdem generis also suggests that § 1 should be interpreted narrowly. Application of this principle here indicates that the general reference to "any other class of workers engaged in foreign or interstate commerce" is most reasonably construed to include only workers who, like the "seamen" and "railroad employees," are themselves engaged directly in the movement of goods in interstate commerce. *See, Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 598 (6th Cir.1995) (quoting *Tenney Engineering Inc. v. United Electrical, Radio & Machine Workers of America, Local 437,* 207 F.2d 450, 452 (3d Cir. 1953)).

Congress' phraseology in § 2, the primary substantive provision of the FAA, also supports a narrow interpretation of the employment exclusion clause. *See Asplundh Tree,* 71 F.3d at 601; *Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 273, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *Cole,* 105 F.3d at 1471–72. Section 2 states that arbitration agreements in contracts "evidencing a transaction *involving commerce*" are enforceable in federal courts. 9 U.S.C. § 2 (1994). Section 1, by contrast, excludes employment contracts of "workers *engaged in* ... interstate commerce.*" The majority offers no textual support for reading these two phrases as having the same scope. Instead, it premises this conclusion on the assertion that Congress in 1925 used these phrases interchangeably. This assertion is without support, however, as the FAA "is the only federal statute that uses the word 'involving' to describe an interstate commerce relation." *Allied–Bruce,* 513 U.S. at 273, 115 S.Ct. 834. Additionally, this textual argument is particularly persuasive in the light of the fact that

when Congress reenacted the FAA in 1947 it was settled law that the phrase "engaged in commerce" was not coextensive with the limits of the power of Congress over interstate commerce. *See, e.g., FTC v. Bunte Bros,* 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881 (1941); *Kirschbaum v. Walling,* 316 U.S. 517, 522, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942); *Overstreet v. North Shore Corp.,* 318 U.S. 125, 128–29, 63 S.Ct. 494, 87 L.Ed. 656 (1943).

By utilizing the traditional tools of statutory construction, the plain meaning of the exclusionary clause becomes clear: employment contracts for seamen, railroad workers, and other workers actually involved in the flow of commerce are excluded from the scope of the FAA. "The plain meaning of legislation should be conclusive, except in the rare case in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *United States v. Ron Pair Enters.,* 489 U.S. 235, 243, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

The majority finds that this is one of the rare cases in which the traditional rules of statutory construction are inapplicable because their use would defeat the "obvious scope and purpose" of the exclusionary clause. The majority, however, does not find the indicia of congressional intent in either the text or structure of the Act. Rather, it divines from the historical context and legislative history that Congress clearly intended that the Act would apply only to commercial disputes and not to labor disputes. I disagree. Even assuming that the scant legislative history can be read to support such an interpretation, I agree with the D.C. Circuit that "[i]n a case such as this, where the statutory text does not admit of serious ambiguity, ... legislative history is, at best, secondary and at worst irrelevant." *Cole,* 105 F.3d at 1472 (citing *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 808–809 n. 3, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989)).

For the foregoing reasons, I would find that, because Craft does not work in interstate commerce, this court has jurisdiction to

hear this appeal under the FAA and would decide the case on the merits.