**Joseph E. KROPFELDER**

v.

**SNAP–ON TOOLS CORP.**

No. K–94–867.

United States District Court,
D. Maryland.

Aug. 10, 1994.

Stephen D. Langhoff, Joseph Tauber, and Langhoff & Wacker, P.C., Baltimore, MD, for plaintiff.

Darrell R. Van Deusen, Scharon L. Ball, and Venable, Baetjer & Howard, Baltimore, MD, for defendant.

FRANK A. KAUFMAN, Senior District Judge:

Plaintiff began working for defendant Snap-on in 1979 as a stockroom warehouseman in defendant's Baltimore area warehouse which received and sent goods from and into interstate commerce. According to Snap-on's 1993 letter to shareholders,[1] "the foundation of Snap-on [Tools]" is "direct sales [of tools] to professional technicians in automotive service" through mobile dealer vans. In 1986, plaintiff was promoted to warehouse manager and signed an employment agreement with defendant. That

1. That letter is attached to plaintiff's memoran- dum and is filed as an exhibit in this case.

agreement did not contain an arbitration clause. Defendant believes that plaintiff did not sign further agreements in 1987, 1988, or 1989, although plaintiff "has no reason to believe that contracts were not signed" for those years.[2] Plaintiff signed an agreement with defendant on January 2, 1990, which, apparently, was the first contract between the parties which contained an arbitration clause. Plaintiff signed another agreement with an arbitration clause on March 26, 1991, concerning the period from January 1, 1991 to December 31, 1991. On February 12, 1992, plaintiff signed another agreement, running from January 1, 1992, to December 31, 1992, also containing an arbitration clause. The latter reads as follows:

> Any controversy or dispute out of or relating to this Agreement or breach thereof, including but not limited to its termination, ... shall be submitted to final and binding arbitration as the sole and exclusive remedy for any controversy or dispute.

No agreement was signed by the parties in relation to the year 1993.

During 1992, a series of thefts occurred in defendant's Baltimore warehouse where plaintiff was the manager. On March 4, 1993, defendant questioned plaintiff about his knowledge of the thefts. Plaintiff asserts that defendant's questioning led plaintiff to suffer severe emotional trauma and that as a result plaintiff became unable to work. Plaintiff received short-term disability leave beginning on July 27, 1993, and has not returned to work since that date. In this case, plaintiff contends that he is entitled to receive benefits under defendant's severance plan, which is governed by ERISA, because the Baltimore warehouse, in which he worked, closed on September 3, 1993, resulting in the elimination of his position. Defendant contends that plaintiff was not discharged as a result of the closing and is therefore not entitled to benefits under the plan. In addition, defendant claims that the said dispute is subject to arbitration in accord with the 1992 employment agreement. In response, plaintiff states that because he did not sign an employment contract in 1993,

he is not bound to arbitrate the within dispute. Further, plaintiff contends that he falls within the exclusionary language of section 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, which provides that the FAA does not govern the "class of workers engaged in foreign or interstate commerce."

"In determining whether parties should be compelled to arbitrate, courts 'perform a two-step inquiry ... 'First, the court must determine whether the parties agreed to arbitrate the dispute.... [Then] it must consider whether any federal statute or policy renders the claims nonarbitrable.'" *Weston v. ITT–CFC,* 8 IER Cases 503, 504, 1992 WL 473846 (N.D.Tex.1992) (quoting *R.M. Perez & Associates, Inc. v. Welch,* 960 F.2d 534, 538 (5th Cir.1992) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985))).

## AGREEMENT TO ARBITRATE

The general presumptions governing arbitration disputes under the FAA are set forth by Judge Russell in *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,* 867 F.2d 809 (4th Cir.1989):

> Of course, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' Nonetheless, it is well settled that there exists a 'healthy regard for the *federal policy favoring arbitration.'* Indeed, the heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration. Thus '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *Doubts should be resolved in favor of coverage.'*

Id. at 812 (emphasis added) (citations omitted).

---

**2.** Plaintiff has filed as an exhibit his 1989 contract with defendant. Accordingly, it would ap-

pear that plaintiff did sign a contract with defendant in that year.

As Judge Niemeyer has written, the FAA "leaves interpretation of an [arbitration] agreement to the application of common law principles of contract law." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 101 (4th Cir.1991) (citing *Perry v. Thomas*, 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987)). With regard to whether terms set forth in the 1992 employment agreement survived into 1993, "if the parties at the expiration of a written contract of employment, continue as before without a new express agreement, it will be inferred that the service and the compensation are the same as before." 2 *Corbin on Contracts* § 504, at 717 (1963). "When a contract of employment for a definite time has been made, and the employee's services are continued after the expiration of the definite time without objection, the inference is ordinarily that the parties have assented to another contract for a term of the same length with the same salary and conditions of service." 2 *Williston on Contracts* § 6.42, at 452 (4th ed. 1991). Judge Russell has affirmed those common law principles, noting that " 'continuance of employment can be evidence of an implied agreement to the terms of that employment.' " *Bodie v. City of Columbia*, 934 F.2d 561, 564 (4th Cir.1991) (quoting *Rousseau v. Teledyne Movible Offshore, Inc.*, 805 F.2d 1245 (5th Cir.1986), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987) (citing *Shepler v. Crucible Fuel Co.*, 140 F.2d 371, 374 (3rd Cir.1944))).[3]

In *Luden's Inc. v. Local Union No. 6 of the Bakery*, 28 F.3d 347 (3d Cir.1994), the Third Circuit was called upon to determine whether the parties' duty to arbitrate survived the plaintiff's affirmative termination of the collective bargaining agreement between the parties. Relying on the aforementioned common law authority, Judge Becker concluded that the duty to arbitrate continued as a term of an implied-in-fact collective bargaining agreement—even where one party had unilaterally terminated the agreement:

> [G]eneral principles of contract law teach us that when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby, or both parties mutually intend that the terms not survive. The rationale for this rule is straightforward: when parties to an ongoing, voluntary, contractual relationship, especially a relationship which by its nature generally implies that some mutually agreed upon rules govern its configuration, continue to behave as before upon the lapse of the contract, barring contrary indications, each party may generally reasonably expect that the lapsed agreement's terms remain the ones by which the other party will abide.

*Id.* at 355–56.[4]

Herein, plaintiff argues that none of his employment contracts with defendant contain

---

**3.** Justice Kennedy has commented that arbitration provisions in collective bargaining agreements governed by the National Labor Relations Act may survive expiration of the agreement where, "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 206, 111 S.Ct. 2215, 2225, 115 L.Ed.2d 177, 196–197 (1991). In *Litton*, the Supreme Court recognized the principle that "termination of [an] employment contract 'does not necessarily terminate a provision for arbitration or other agreed procedure for the resolution of disputes.' " *Id.* at 208 n. 3, 111 S.Ct. at 2226 n. 3, 115 L.Ed.2d at 198 n. 3 (quoting *Mendez v. Trustees of Boston University*, 362 Mass. 353, 285 N.E.2d 446, 448 (1972)).

**4.** In the within case, the employment agreement provides that "the laws of the State of Wisconsin shall govern" the interpretation of the agreement. With certain exceptions, "the parties to a contract may agree as to the law which will govern their transaction, even as to issues going to the validity of the contract." *Kronovet v. Lipchin*, 288 Md. 30, 43, 415 A.2d 1096 (1980). Plaintiff does not object to the application of Wisconsin law *per se*, but apparently believes that because, from plaintiff's point of view, there is no valid contract between the parties, then any choice of law determination is irrelevant. In any event, both Wisconsin and Maryland courts follow the general common law principle set forth *supra*. *See as to Maryland law, McCullough Iron Co. v. Carpenter*, 67 Md. 554, 11 A. 176 (1887) (referring to "the weight of authority both in England and this country," the Court of Appeals

provisions automatically renewing the contract at the end of the term, and that 1993 was the first year in which defendant did not present a contract to plaintiff for signature.[5] Plaintiff states that defendant chose not to have employees sign contracts in 1993 because it knew it would be closing the warehouse and sought to convert employment status to at-will employment. The fact that 1993 may have been the first year in which defendant did not offer employment contracts to employees does raise the question of whether such failure was meant to signal that the terms of prior contracts were terminated. In *Borg–Warner Corp. v. Ostertag*, 18 Wis.2d 484, 118 N.W.2d 900 (1963), the Supreme Court of Wisconsin concluded that where an employee signed contracts in two successive years, a contract would not be implied for the third year in which no contract was signed. However, in *Borg–Warner* the employee asked about a new contract for the third year, the employer felt free to change the contract terms, and the contracts specified monetary bonuses based on the year particularly specified. In that context, the Wisconsin court concluded that "[i]t appears at most the old terms of employment were to continue until the parties reached a new agreement, or found they could not agree." 118 N.W.2d at 903.

 In this case, the failure to sign a new agreement, without any explanation by either party, would not appear enough to rebut the presumption favoring extension of

the terms of definite contracts with specific arbitration clauses—especially in the light of the strong federal policy favoring arbitration. Moreover, it appears that plaintiff has received disability benefits pursuant to the 1992 contract, past the date of expiration of that contract. Such payment and acceptance of benefits indicates, in this Court's view, an intent to continue the terms of the prior contract.[6] "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). Unlike *Borg–Warner*, neither party in the within case indicated any intent to alter the terms of employment,[7] nor did plaintiff inquire, before or during 1993, into what terms governed his employment after 1992. Moreover, the yearly contracts in the within case were very similar in content and not tied to specific events occurring within the given year, as was the case in *Borg–Warner*. Accordingly, this Court hereby determines that the parties' 1992 contract, including in this regard the arbitration clause, continued as part of an implied-in-fact contract in 1993.[8]

## CONTRACTS OF EMPLOYMENT AND THE FAA

That brings us to the question of whether the parties are required to arbitrate pursuant to the FAA. Plaintiff claims that he is

---

of Maryland has written that, "The case of *Beeston v. Collyer*, 4 Bing. 309, distinctly decides that, if the contract for a year is made, and the parties do not disagree, and the service continues, the same contract prevails for the next year during which service has continued, without new agreement."). *See as to Wisconsin law, Borg–Warner Corp. v. Ostertag*, 18 Wis.2d 484, 118 N.W.2d 900, 903 (1963) ("Where an employee is hired by the year and continues in employment after the end of a particular year, there is a presumption that he is again employed for the new year on the same terms as before.").

5. It remains a matter of dispute between plaintiff and defendant whether any such contracts were signed in 1987 and 1988. Neither party has produced contracts covering those years.

6. Plaintiff contends that he did not ask for disability benefits to be paid to him pursuant to the 1992 contract, but rather received the same at

the suggestion of the branch manager. However, the manager's alleged offer to plaintiff of disability benefits at least evidences some intent on the part of defendant to abide by the terms of the 1992 agreement.

7. If as plaintiff asserts, defendant purposely did not offer employees 1993 contracts in order to convert their employment into at-will employment, it is in any event to be noted that defendant would appear bound by its representations and arguments in this case that the 1992 contracts—in their entirety—extend into 1993, and that defendant would not be able to reap the benefits of the extended contracts in some respects and not in others.

8. Although the parties do not address or contest the issue, statutory ERISA claims are subject to arbitration under the FAA. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1116 (3rd Cir.1993).

not required to arbitrate the within dispute because the FAA does not apply to employment contracts generally. Under 9 U.S.C. § 1, the FAA does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

"Since the FAA's enactment, circuit courts have split over whether th[e] exception applies to *all* employment contracts, or only those contracts involving a class of workers actually engaged in interstate commerce." *Crawford v. West Jersey Health Systems,* 847 F.Supp. 1232, 1240 (D.N.J.1994) (Brotman, J.). The Supreme Court explicitly declined to address that open question in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24–25 n. 2, 111 S.Ct. 1647, 1651 n. 2, 114 L.Ed.2d 26, 36–37 n. 2 (1991). In *Gilmer,* the plaintiff, a securities representative, sued her employer for alleged federal statutory age discrimination (ADEA) violations. Her registration form for the New York Stock Exchange required arbitration of disputes arising between brokers and their employers. The Supreme Court determined that the registration form did not constitute an employment contract, and that therefore, the Court need not address whether § 1 excluded the contract as an employment contract. Although noting that "[s]everal amici curiae ... argue that [§ 1] excludes from the coverage of the FAA *all* 'contracts of employment'.... we leave for another day the issue raised by amici curiae." *Id.* Justice Stevens, in dissent, wrote that, "[i]n my opinion, arbitration clauses contained in employment agreements are specifically exempt from coverage of the FAA." *Id.* at 36, 111 S.Ct. at 1657, 114 L.Ed.2d at 43–44.

Although the Supreme Court has not decided the issue, several circuit courts have. "Courts have generally limited [the exception in § 1] to employees, unlike appellant [a stock broker], involved in, or closely related to, *the actual movement of goods in interstate commerce." Dickstein v. du Pont,* 443 F.2d 783, 785 (1st Cir.1971) (emphasis added); *see also Miller Brewing Co. v. Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1162 (7th Cir.1984) ("workers employed in the transportation industries"), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1069 (2d Cir.1972) ("those actually in the transportation industry"); *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers,* 207 F.2d 450, 453 (3d Cir.1953) ("acting directly in the channels of commerce itself"). As explained in *DiCrisci v. Lyndon Guar. Bank,* 807 F.Supp. 947, 953 (W.D.N.Y.1992), the legislative history and statutory structure appear to support that view:

> Although at first glance it might seem likely that Congress would have intended 'commerce' to have the same meaning throughout the Act, the reference to 'workers engaged in foreign or interstate commerce' in § 1 would be surplusage if it were simply coextensive with Congress' powers under the commerce clause. Under *Southland Corp. [v. Keating,* 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) ], § 2 gives the Act as a whole the same reach as Congress' commerce clause power. Therefore, if Congress had wanted to excluded [sic] all employment contracts from the Act, it could simply have said 'employment contracts' and left it at that. Any workers beyond the reach of the commerce clause would not be covered by the Act in the first place. The language of § 1 also reinforces this view; the reference to 'seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce,' suggests that Congress intended to refer to workers engaged in commerce *in the same way* that seamen and railroad workers are.[9]

> In exempting [seamen] the draftsmen excluded also railroad employees, another class of workers as to whom special procedure for the adjustment of disputes had previously been provided. Both these classes of workers were engaged *directly* in interstate or foreign commerce. To these the draftsmen of the Act added 'any other class of workers engaged in

9. Judge Maris in *Tenney* noted that the only reference in the legislative history to the exclusion in § 1 came from a representative of the seamen's union, which took " 'the position that seamen's wages came within admiralty jurisdiction and should not be subject to an agreement to arbitrate.' " *Id.* at 452 (quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., p. 1). In *Tenney,* Judge Maris wrote:

*Id.* However, the Sixth Circuit, in a securities context similar to that in *Gilmer,* recently has seemingly gone against the weight of authority and suggested that *all* employment contracts are outside coverage of the FAA. *Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305 (6th Cir.1991). In *Willis,* Judge Jones relied on a statement to the Congress by the chairman of the ABA committee responsible for drafting the bill. The latter indicated that the Act was not meant to cover labor disputes, but only "an act to give the *merchants* the right or privilege of sitting down and agreeing *with each other* as to what their damages are, if they want to do it.". *Id.* at 311 (quoting *Hearings on S. 4213 and S. 4214 Before the Subcomm. on the Judiciary,* 67th Cong. 4th Sess. 9 (1923)).

The Fourth Circuit last spoke directly to this issue almost forty years ago in *United Electrical, Radio & Mach. Workers v. Miller Metal Products, Inc.,* 215 F.2d 221 (4th Cir. 1954), upon which plaintiff relies for the proposition that § 1 excludes all workers engaged in interstate commerce. That reliance appears misplaced since, in *Miller Metal,* Judge Parker wrote:

> What we decide, and all we decide, is that the arbitration clause in the collective bargaining agreement here does not cover the matter of damages arising out of violation of the no-strike clause and that the provisions of the United States Arbitration Act may not be relied on to stay proceedings in a suit brought on a collective bargaining agreement entered into by workers en-

gaged in interstate commerce as those here were engaged.[10] *Id.* at 224. Judge Parker expressly distinguished arbitration agreements in individual employment contracts from those in collective bargaining agreements:

> It appears that the exclusion clause of the Arbitration Act was introduced into the statute to meet an objection of the Seafarers International Union; and certainly such objection was *directed at including collective bargaining agreements rather than individual contracts of employment* under the provisions of the statute. The terms of the collective bargaining agreement become terms of the individual contracts of hiring made subject to its provisions and the controversies as to which arbitration would be appropriate arise in almost all instances, not with respect to the individual contracts of hiring, but with respect to the terms engrafted on them by the collective bargaining agreement. It is with respect to the latter that objection arises to the compulsory submission to arbitration which the Arbitration Act envisages. *No one would have serious objection to submitting to arbitration the matters covered by the individual contracts of hiring divorced from the provisions grafted on them by the collective bargaining agreements.*[11]

*Id.* (emphases added). Thus, it would appear that the Fourth Circuit, in 1954, approved of the submission of disputes arising under individual employment contracts to ar-

foreign or interstate commerce.' We think that the intent of the latter language was, under the rule of ejusdem generis, to include only those other classes of workers who are likewise engaged directly in commerce, that is, only those other classes of workers who are *actually engaged in the movement* of interstate or foreign commerce or in *work so closely related* thereto as to be in practical effect part of it. The draftsmen had in mind the two groups of transportation workers as to which special arbitration legislation already existed and they rounded out the exclusionary clause by excluding all other similar classes of workers. *Id.* at 452–453 (emphasis added) (footnotes omitted).

**10.** The Fourth Circuit has subsequently affirmed that "we have consistently recognized that the

FAA does not apply to disputes stemming from collective bargaining agreements." *Domino Sugar v. Sugar Workers Local 392,* 10 F.3d 1064, 1067 (4th Cir.1993) (citing *inter alia* to *Miller Metal* and to decisions of other circuits which agree with that principle).

**11.** In *Miller Metal,* Judge Parker stated that, at least with regard to collective bargaining agreements, the Fourth Circuit was not "impressed by the argument that the excepting clause of the statute should be construed as not applying to employees engaged in the production of goods for interstate commerce as distinguished from workers engaged in transportation in interstate commerce, as held by the majority in *Tenney.*" *Id.* at 224. That statement was made in the context of arbitration agreements contained in collective bargaining agreements.

bitration under the FAA.[12] In 1991, in *Whiteside v. Teltech Corp.*, 940 F.2d 99 (4th Cir.1991), the Fourth Circuit concluded that the district court should not have refused to grant in a federal suit a petition to compel arbitration because the dispute sought to be arbitrated was the subject of a pending state case, and thus, the Fourth Circuit remanded the case to the district court for further proceedings. *Whiteside* involved an arbitration provision contained in an individual employment contract between a senior vice president and his employer. Judge Niemeyer wrote that "[a]lthough the appellant has also requested that we review the nature of the dispute and compel arbitration, we decline the invitation so that the district court, in the first instance, can make that determination." *Id.* at 100.

■ In the within case this Court must decide whether our plaintiff is excluded from the coverage of the FAA because of the nature of his work. In the light of the time which has passed since the *Miller Metal* decision,[13] the strong federal policy in favor of arbitration, and the great weight of circuit court authority, this Court is of the view that the Fourth Circuit would not, as of this date, apply the words used in *Miller Metal* so as to exclude § 1's application in all non-collective bargaining contexts, and would instead apply the views expressed by a majority of courts that as to non-collective bargaining contracts the FAA excludes only those workers involved in the interstate transportation of goods.

■ The bulk of the decided cases which discuss the reach of § 1 relate to workers who were clearly not involved in a *transportation* industry.[14] The facts in the within case pose a much tougher question because plaintiff's work is closely related to interstate commerce. Plaintiff has stated in an affidavit filed in this case that his "primary function was to receive products which were trucked to the warehouse from various manufacturers, including Snap-on's manufacturing facility in Kenosha, Wisconsin, and other manufacturers in various other states. The warehouse then stored these products until Snap-on's dealers and industrial sales representatives ordered them from the warehouse. When an order was received in the warehouse, I was responsible for seeing that the order was pulled, packaged for the dealer, labeled, and loaded onto trucks which delivered it to the dealers.... I actually loaded and unloaded these trucks." Since defendant provides no factual evidence to the contrary, and does not contest plaintiff's said statement, this Court accepts the factual picture as so described by plaintiff.

Unlike seamen or railroad employees, however, plaintiff is not within a class of employees who "as to which special arbitration legislation already existed" at the time the FAA was enacted. *Tenney*, 207 F.2d at 452. Nor is plaintiff directly involved in the transportation business, although he has strong, close, and rather immediate contact with those who are so involved. To the best of this Court's knowledge, there are no cases which involve the exact facts of the within case, that is,

12. *See also* Judge Parker's earlier opinion in *International Union United Furniture Workers v. Colonial Hardwood Flooring Co.*, 168 F.2d 33 (4th Cir.1948), in which he wrote that the FAA "may not be applied to this contract, because it is a contract relating to the employment of workers engaged in interstate commerce, within the clear meaning of the exclusion clause contained in the first section." *Id.* at 35. *Colonial Hardwood* involved a collective bargaining agreement.

13. Judge Shoob noted that the Fourth Circuit's distinction in *Miller Metal*, with regard to § 1's application, between workers involved in transportation, on the one hand, and those, on the other hand, involved in manufacturing "dates from a period when arbitration remained a somewhat disfavored means of dispute resolution." *Hydrick v. Management Recruiters Int'l,*

*Inc.*, 738 F.Supp. 1434, 1435 n. 1 (N.D.Ga.1990) (citing *Mitsubishi Motors*, 473 U.S. at 626–27, 105 S.Ct. at 3353–54). In any event, this Court suggests that the Fourth Circuit in *Miller Metal* at most rejected that distinction in the context of collective bargaining agreements.

14. *See Erving*, 468 F.2d at 1069 (basketball player); *Dickstein*, 443 F.2d at 785 (brokerage account executive); *Weston*, 8 IER Cases at 505, 1992 WL 473846 (worker in loan servicing industry); *Crawford*, 847 F.Supp. at 1242 (medical director); *DiCrisci*, 807 F.Supp. at 952 (operations manager for financial corporation); *Dancu v. Coopers & Lybrand*, 778 F.Supp. 832, 834 (E.D.Pa.1991) (management consultant), *aff'd*, 972 F.2d 1330 (3rd Cir.1992); *Hydrick*, 738 F.Supp. at 1435 (worker in personnel placement company).

warehousemen clearly engaged in interstate commerce, but not engaged in work which is substantially similar to that of seamen or railroad employees. In that context, again noting the "liberal federal policy favoring arbitration," *Whiteside*, 940 F.2d at 101, and mindful that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), this Court concludes that plaintiff's relationship with interstate commerce, while quite substantial, is not sufficiently similar to that of seamen and railroad workers so as to bring him within the § 1 exemption. Accordingly, defendant's motion to compel arbitration will be granted, and all other proceedings in this case will be stayed pending completion of said arbitration. The parties are asked in joint, written communications, to be filed on each six month anniversary of the date of this opinion, to inform this Court of the status of such arbitration.