Percilla D. RUDOLPH, Plaintiff,

v.

ALAMO RENT A CAR, INC., Defendant.

Civ. A. No. 2:96cv732.

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 28, 1997.

William Greer McCreedy, II, Kellam, Pickrell, Cox & Taylor, and Francis Sullivan Callahan, Norfolk, VA, for Percilla D. Rudolph, plaintiff.

John Robert Hunt, Stokes & Murphy, Atlanta, GA, and John Raymond Doyle, III, Doyle & Babineau, Norfolk, VA, for Alamo Rent-a-Car, Inc.

*OPINION AND ORDER*

DOUMAR, District Judge.

This matter is before the Court on defendant's motion to stay these proceedings and compel arbitration. For the reasons set forth below, this motion is hereby denied.

I. Background

Percilla D. Rudolph, a female, was employed by Alamo Rent–A–Car, Inc. from September 2, 1994 until September 1, 1995. Rudolph does not belong to a union. In her complaint, she alleges that she was sexually harassed at work, in violation of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e, *et seq.*, and Section 102 of the Civil Rights Act of 1991, codified at 42 U.S.C. § 1981a. She further alleges that she resigned from work both because of this harassment and because Alamo demanded

her resignation after she filed a complaint with the EEOC.

Alamo has filed a motion requesting the Court to stay these proceedings and order arbitration of this dispute. Alamo asserts that Rudolph's employment contract, which apparently was signed by Rudolph shortly after the commencement of her employment with Alamo, necessitates the submission of her claims to arbitration. Rudolph disagrees.

The employment contract into which Rudolph and Alamo entered is entitled "My Personal Alamo Family Member Pact," which is abbreviated "Fampact." The document, prepared by Alamo but written in its employees' voices, defines itself: "It is my personal agreement of employment with Alamo." Def.Ex. 1. Paragraph Two of Fampact states in relevant part:

2. EMPLOYMENT DATE. My employment will begin or did begin on the date which is set forth on the last page of this Fampact.

MY BILL OF RIGHTS. I will have the following rights as an Alamo family member:

(a) Beginning with the very first day of my employment:

(1) the right to be treated with dignity and respect;

(2) the right to be free from discrimination;

(3) the right to be free from harassment;

(4) the right to a drug-free and alcohol-free workplace;

(5) the right to know what is expected of me;

(6) the right to know how I am performing in my job;

(7) the right to receive my pay;

(8) the right to use the Alamo "Open Door" policy;

(9) the right to certain benefits outlined below in the Schedule of Benefits.

(b) After completion of my probationary-at-will period:

(10) the right to participate in Alamo's group health insurance plan;

(11) the right to participate in certain additional benefits outlined below in the Schedule of Benefits;

. . . .

Def.Ex. 1.

Paragraph Four of Fampact states in relevant part

4. MY PROBATIONARY PERIOD. . . . [M]y first one hundred eighty (180) days of employment is my "probationary-at-will" period. This period gives me and Alamo the necessary time and opportunity to determine whether we meet each other's initial expectations.

. . . .

I FULLY UNDERSTAND THAT DURING MY PROBATIONARY–AT–WILL PERIOD, I MAY BE RELEASED OR DISCHARGED AT ANY TIME, IN ALAMO'S SOLE JUDGEMENT AND DISCRETION. HOWEVER, ONCE I HAVE SUCCESSFULLY COMPLETED THIS PERIOD, I THEN BECOME A REGULAR ALAMO FAMILY MEMBER AND AM ENTITLED TO THE ADDITIONAL RIGHTS AND BENEFITS PRESCRIBED IN THIS FAMPACT.

Finally, Paragraph Twenty–Five of Fampact provides an arbitration clause:

25. ARBITRATION: If I claim that Alamo has violated this FamPact, I agree that the dispute shall be submitted to and resolved through binding arbitration. . . . The Association's "Rules for Employee Dispute Resolution" shall be used in any arbitration proceeding. Judgment on the award or decision . . . shall be final and binding.

Def.Ex. 1.

Arguing in its brief that Fampact obligated the parties to submit all employment disputes to arbitration, Alamo urges the Court to compel arbitration. Rudolph offers several defenses to Alamo's motion. First, she argues that the arbitration clause in Fampact clearly refers only to claimed breaches of Fampact, and does not refer to claimed violations of statutory law. Second, she argues

that the arbitration clause does not apply to her claims of harassment, which in part allegedly occurred during her probationary period. Finally, she argues that the Federal Arbitration Act, the statute upon which courts often rely in enforcing agreements to arbitrate, does not apply to Fampact. Alamo disputes each of these arguments.

## II. Analysis

The Court must decide first whether the Federal Arbitration Act applies to Fampact, then whether Fampact's arbitration clause applies to claims arising in part during an Alamo employee's probationary period, and finally whether Fampact's arbitration clause indicates that the parties intended to arbitrate Rudolph's *statutory* right to be free from sexual harassment.

### A. The Federal Arbitration Act

The purpose of the Federal Arbitration Act, 9 U.S.C. §§ 1–14, ("FAA"), "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20 and n. 6, 105 S.Ct. 1238, 1241–42 and n. 6, 84 L.Ed.2d 158 (1985). The primary substantive portion of the FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable...." 9 U.S.C. § 2. The Supreme Court has explained that in general, the FAA establishes a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

Notably, however, Section One of the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In *Gilmer*, the

Supreme Court explicitly declined to decide whether this meant that the FAA excludes from coverage all contracts of employment. *See Gilmer*, 500 U.S. at 25 n. 2; 111 S.Ct. at 1651 n. 2. Because of *Gilmer's* refusal to answer this question, lower courts have continued to disagree about the precise extent to which Section One excludes employment contracts from FAA coverage. *See Crawford v. West Jersey Health Systems*, 847 F.Supp. 1232, 1240 (D.N.J.1994) (noting disagreement among courts regarding the extent of the exclusion).

Nevertheless, "[c]ourts have generally limited [the exclusion in Section One] to employees ... involved in, or closely related to, the actual movement of goods in interstate commerce." *Dickstein v. duPont*, 443 F.2d 783, 785 (1st Cir.1971); *see also Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592 (6th Cir. 1995) ("exclusionary clause of § 1 of the Arbitration Act should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are."); *Miller Brewing Co. v. Brewery Workers Local Union No. 9*, 739 F.2d 1159, 1162 (7th Cir.1984) (exclusion applies only to those employed in the transportation industries); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069 (2d Cir.1972) (same). *But see Arce v. Cotton Club of Greenville, Inc.*, 883 F.Supp. 117 (N.D.Miss.1995) (explicitly criticizing these cases).

The Fourth Circuit has only alluded to this issue once, and that case was decided over forty years ago. In *United Electrical, Radio, & Mach. Workers v. Miller Metal Products, Inc.*, 215 F.2d 221 (4th Cir.1954), the Fourth Circuit wrote

> What we decide, and all we decide, is that the arbitration clause in the collective bargaining agreement here does not cover the matter of damages arising out of violation of the no-strike clause and that the provisions of the United States Arbitration Act may not be relied on to stay proceedings in a suit brought on a collective bargaining agreement entered into by workers en-

gaged in interstate commerce as those here were engaged.

*Id.* at 224.

The Court continued, however,

It appears that the exclusion clause of the Arbitration Act was introduced into the statute to meet an objection of the Seafarers International Union; and certainly such objection was directed at including collective bargaining agreements rather than individual contracts of employment under the provisions of the statute.... No one would have serious objection to submitting to arbitration the matters covered by the individual contracts of hiring divorced from the provisions grafted on them by the collective bargaining agreements.

*Id.*

Thus, the Court does not construe *Miller Metal* to indicate that the Fourth Circuit would read Section One of the FAA to exclude broadly all individual employment contracts from FAA coverage.

■ In fact, a quick review of recent Fourth Circuit opinions indicates a strong affinity for arbitration. In the past decade, the Fourth Circuit has led the nation in embracing arbitration as a means of resolving employment related disputes. Indeed, the Supreme Court's landmark decision in *Gilmer,* which held enforceable an arbitration provision compelling arbitration of an alleged Age Discrimination in Employment Act violation, simply affirmed the result and reasoning reached by the Fourth Circuit in that same case. *See Gilmer v. Interstate/Johnson Lane Corp.,* 895 F.2d 195 (4th Cir.1990). In addition, the Fourth Circuit recently has moved again to the forefront in favoring arbitration of employment-related disputes, standing alone among the federal circuits thus far in extending *Gilmer* to the collective bargaining context. *See Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.1996). Thus, when the precise question of whether Section One of the FAA excludes from FAA coverage the individual employment contracts of all employees reaches the Fourth Circuit, this Court believes that the Fourth Circuit will join every other federal circuit in ruling that it does not.

Indeed, another district court within the Fourth Circuit has recently arrived at this same conclusion. *See Kropfelder v. Snap–On Tools Corp.,* 859 F.Supp. 952 (D.Md.1994). In *Kropfelder,* a stockroom warehouseman bound by an individual employment contract containing an arbitration clause argued that Section One of the FAA excluded the contract from FAA coverage. Judge Kaufman, in his well-reasoned opinion, concluded,

In the within case this Court must decide whether our plaintiff is excluded from the coverage of the FAA because of the nature of his work. In the light of the time which has passed since the *Miller Metal* decision, and the great weight of circuit court authority, this Court is of the view that the Fourth Circuit would not, as of this date, apply the words used in *Miller Metal* so as to exclude § 1's application in all non-collective bargaining contexts, and would instead apply the views expressed by a majority of courts that as to non-collective bargaining contracts the FAA excludes only those workers involved in the interstate transportation of goods.

*Id.* at 958.

■ Other courts similarly note that *Miller Metal* limited its holding to the applicability of the exclusionary clause in Section One of the FAA to collective bargaining agreements, and those courts also similarly doubt the continued viability of *Miller Metal* in the Fourth Circuit. *See, e.g., Asplundh Tree,* 71 F.3d at 600 ("It is questionable whether *Miller Metal Products* is still good law even in the Fourth Circuit."). Therefore, following the clear weight of authority on the issue, this Court holds that the FAA does apply to Rudolph's employment contract, notwithstanding the narrow exclusionary clause contained in Section One of the FAA.

### B.   The Effect of the Probationary Period

■ Rudolph alleges that some of the harassment occurred during her probationary period. Because Fampact apparently provides that her employment is at-will during her probationary period, Rudolph argues that the arbitration clause in Fampact does

not apply to employment disputes arising during the probationary period.

■ As Fampact itself states, however, Rudolph's right to be free from harassment began "the very first day of [her] employment." Def.Ex. 1. Further, nothing in Fampact's arbitration clause limits its applicability to only those disputes arising *after* the probationary period. In addition, courts must resolve any doubts concerning the scope of arbitrable issues in favor of arbitration. *See Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985). Even without this presumption of arbitrability, however, straightforward contractual interpretation indicates that the arbitration clause applies to disputes arising in part during Rudolph's probationary period.

### C. Applicability of the Arbitration Clause to Rudolph's Statutory Claim

The arbitration clause in Fampact states, "If I claim that Alamo has violated this Fam-Pact," the claim must be submitted to arbitration. *See* Def.Ex. 1. The "Bill of Rights" in Fampact states that Rudolph has "the right to be free from harassment" and "the right to be free from discrimination," without providing definition for either "discrimination" or "harassment." More importantly, Fampact clearly does not contractually bind Alamo to observe Rudolph's statutory rights under Title VII and other federal laws. Nevertheless, Alamo argues that the arbitration clause in Fampact, which appears to mandate arbitration only for alleged violation of Rudolph's *contractual* rights (i.e., her rights under Fampact), also mandates arbitration for alleged violations of Rudolph's *statutory* rights (i.e., her right under Title VII not to be sexually harassed in the workplace,) despite Fampact's failure to even mention Rudolph's statutory rights. In considering this question, the Court's research has unearthed a seemingly conflicting body of precedent, offering some insight but little definitive guidance. Thus, a short discussion tracing the history of that precedent follows.

#### 1. Precedent

In *Alexander v. Gardner–Denver,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court considered whether a discharged, unionized employee whose grievance had been arbitrated pursuant to an arbitration clause in a collective-bargaining agreement was precluded from subsequently bringing a Title VII action based upon the conduct that was the subject of the grievance. The agreement provided that "there shall be no discrimination against any employee on account of race, color...," but did not bind the employer to observe employees' statutory rights under Title VII. *Id.* at 39, 94 S.Ct. at 1015. Thus, the rights-giving portion of the agreement in *Gardner–Denver* is similar to the Bill of Rights in Fampact. The agreement in *Gardner–Denver* further provided an arbitration clause covering "differences aris[ing] between the Company and the Union as to the meaning and application of the provisions of this Agreement." *Id.* Again similar to Fampact, the arbitration clause in *Gardner–Denver* referred only to disputes arising out of the contract itself.

The Court held that the employee was not foreclosed from pursuing his Title VII claim, and the Court emphasized that an employee's contractual rights under a collective-bargaining agreement are distinct from the employee's statutory rights under Title VII. *Id.* at 48–50, 94 S.Ct. at 1020. The Court wrote,

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.

*Id.*

Eighteen years later, in *Gilmer,* 500 U.S. 20, 111 S.Ct. 1647 (1991), the Supreme Court explicitly left intact *Gardner–Denver* when ending a long-standing mistrust of arbitration. In *Gilmer,* a non-union employee was bound by an arbitration clause providing

mandatory arbitration of "any controversy between [the employee] and [the employer] arising out of the employment or termination of employment of [the employee]." 500 U.S. at 23, 111 S.Ct. at 1650. Notably, by referring to "any controversy ... arising out of ... employment," instead of only disputes arising out of the contract itself, this arbitration clause in *Gilmer* is broader than both the arbitration clause in *Gardner–Denver* and the arbitration clause in Fampact. The Court in *Gilmer* (1) rejected public policy arguments questioning the propriety of submitting to arbitration claims under the Age Discrimination in Employment Act and (2) interpreted Gilmer's arbitration clause to subject such claims to compulsory arbitration. The Court distinguished *Gardner–Denver* by stating

> First, [*Gardner–Denver*] did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, [*Gardner–Denver*] involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. *Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions.* Second, because the arbitration in those cases occurred in the context of a collective bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements."

500 U.S. at 35, 111 S.Ct. at 1657 (emphasis added) (citations omitted).

Relying on the underlying rationale of *Gilmer*, the Fourth Circuit led the nation this past spring in extending *Gilmer* to the collective bargaining context. *See Austin v. Owens–Brockway Glass Container, Inc.*, 78 F.3d 875, 880 (4th Cir.1996). In *Austin*, a collective-bargaining agreement provided:

> 1. The Company and the Union will comply with all laws preventing discrimination against any employee because of race, color, religion, sex, national origin, age, handicap, or veteran status.
>
> . . . .
>
> 3. Any disputes under this Article as with all other Articles of this Contract shall be subject to the grievance procedure.

*Id.* at 879.

The grievance procedure, the *Austin* court noted, explicitly provided for binding arbitration. *Id.* at 880. Similar to Fampact, then, the arbitration provisions in the *Austin* collective bargaining agreement referred only to contractual disputes. Unlike Fampact, however, the rights-giving portion of the *Austin* collective bargaining agreement specifically bound the company to comply with anti-discrimination statutes. Interpreting the contract, the *Austin* court held, "Miss Austin is a party to a voluntary agreement to submit statutory claims to arbitration..... Finding that Congress did not intend to preclude arbitration of claims under Title VII ..., we hold that the arbitration provision in this collective bargaining agreement is enforceable." *Id.* at 885–86.

Thus far, this discussion of precedent establishes two things: (1) the public policy argument that Title VII claims should not be subject to binding arbitration has been rejected; and (2) the Fourth Circuit favors arbitration. This sets the stage but does not answer the question presented in the instant case: can this Court plausibly construe Fampact's arbitration clause, which provides binding arbitration only for alleged violations of Fampact, to mandate binding arbitration of Rudolph's statutory rights?

The Court's research finds only one Fourth Circuit case that provides any further insight. In *Martin Marietta v. Maryland Comm'n on Human Relations*, 38 F.3d 1392 (4th Cir.1994), a collective-bargaining agreement provided a series of protections and procedures regarding employees injured at work. Included in the collective-bargaining agreement was an arbitration clause, which

stated, "[i]nsofar as a grievance shall involve *the interpretation or application of the provisions of the Agreement* and has not been settled satisfactorily [through grievance procedures], it *may be* submitted to an impartial arbitrator...." *Id.* at 1399 (emphasis in original). In rebutting the contention that *Gilmer* meant that this arbitration clause mandated arbitration of an employee's statutory claim of disability discrimination, the *Martin Marietta* court wrote,

> What distinguishes *Gilmer* from the instant case is that the broad mandatory language of the arbitration clause at issue in *Gilmer* ... provided that Gilmer must arbitrate "any dispute, claim or controversy" arising with his employer. The CBA [collective bargaining agreement] applicable [in the instant case] is more narrow, as it is written in permissive terms and encompasses only grievances that involve "interpretation or application" of CBA provisions.

*Id.* at 1402.

Thus, the *Martin Marietta* court distinguished an arbitration clause explicitly referring to arbitration of only *contractual* disputes—as the arbitration clause in Fampact apparently does—from the *Gilmer* arbitration clause, which referred to arbitration for "any controversy ... arising out of ... employment."

Nevertheless, a district court in the Fourth Circuit, without mentioning *Martin Marietta*, recently compelled arbitration of an employee's federal employment discrimination claims based upon an arbitration clause in an individual employment contract providing arbitration for disputes "relating to this Agreement." *See McCrea v. Copeland,* 945 F.Supp. 879 (D.Md.1996). In *McCrea,* Judge Young wrote,

> Plaintiffs also argue for a narrow reading of the phrase "relating to this Agreement" which would limit the scope of the arbitration provision to contract claims related to the performance or breach of obligations set forth specifically in the employment agreement. The Supreme Court, however, has held that any doubt concerning the scope of an arbitration provision should be resolved in favor of arbitration given federal policy favoring arbitration.
>
> . . . .
>
> Accordingly, the Court rejects the narrow reading of "relating to this Agreement" advanced by Plaintiffs and finds the arbitration provision extends to all disputes arising out of the employment relationship [including the federal employment discrimination claims].

*Id.* at 882. At least two other district courts outside of the Fourth Circuit disagree with the analysis in *McCrea. See Randolph v. Cooper Indus.,* 879 F.Supp 518 (W.D.Pa. 1994) (refusing to compel arbitration of employee's discrimination claim, which would violate both his employment contract and Title VII, and distinguishing *Gilmer* because the arbitration clause provided arbitration not for any employment dispute but only contractual disputes); *see also Bush v. Carrier Air Conditioning,* 940 F.Supp 1040, 1045 (E.D.Tex.1996) (distinguishing both *Gilmer* and *Austin* on the same grounds).

### 2. Analysis

analysis The seeming conflict among the precedent discussed above is best described as a tension between the laudable presumption in favor of arbitration and the necessary axiom that the court may not read into a contract that to which the parties did not agree. On the one hand, the presumption in favor of arbitration is not a mindless mantra repeated merely for the sake of consistency; instead, the presumption reflects courts' acknowledgment that the arbitral process often exceeds the judicial process in speed, efficiency, and inexpense. As another opinion this Court has issued today explains, the superiority of arbitration over litigation can hardly be overstated. *See Bright v. Norshipco,* 951 F.Supp. 95 (E.D.Va.1997). Nevertheless, arbitration "is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *PaineWebber, Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir.1996); *see*

also *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.,* 42 F.3d 1292 (9th Cir.1994); *U.S. Postal Serv. v. Nat'l Rural Letter Carriers' Ass'n,* 959 F.2d 283 (D.C.Cir.1992).

Unlike *Gilmer,* in this case, Rudolph did not agree to submit "any controversy . . . arising out of . . . employment" to arbitration. Instead, the arbitration clause in Fampact, similar to the arbitration clauses in *Gardner–Denver, Martin Marietta, Cooper Industries,* and *Carrier Air Conditioning,* indicates that she agreed only to submit to arbitration alleged violations of rights given to her by Fampact. Consequently, in each of these cited cases, the courts held that the arbitration clauses subjected only contractual and not statutory claims to binding arbitration. In contrast to the arbitration clauses in those cases and in Fampact, the arbitration clause in *Gilmer* provided arbitration of any employment dispute, not just contractual disputes. Indeed, the Court in *Gilmer* explicitly relied upon this distinction to embrace arbitration and avoid overruling *Gardner–Denver.* Thus, Fampact's failure to require the submission of any employment dispute to arbitration places the instant case on a very different footing than the agreement in *Gilmer.*

The failure to require arbitration of any employment dispute would not necessarily prohibit the Court from interpreting Fampact to require arbitration of statutory claims, however. In *Austin,* the arbitration clause mandated arbitration for disputes "under [the] Articles of this Contract," yet the majority in *Austin* held that the contract required arbitration of the plaintiff's statutory claims, because the rights-giving portion of the collective-bargaining agreement in *Austin* explicitly bound the plaintiff's employer to comply with "all laws preventing discrimination against any employee because of race, color, religion, sex, national origin, age, handicap, or veteran status." Thus, because the company had an explicit, contractual duty to observe the plaintiff's statutory rights, the majority in *Austin* quite reasonably interpreted the parties' agreement to arbitrate alleged contractual breaches as intending to include the arbitration of statutory disputes.

In the instant case, however, Fampact does not contractually bind Alamo to comply with statutes preventing discrimination and harassment. Unlike the collective bargaining agreement in *Austin,* Fampact never even mentions an employee's statutory right to be free from discrimination and harassment. Taken together with Fampact's failure to require arbitration of "any" employment dispute, the Court simply cannot interpret Fampact to mandate arbitration of Rudolph's statutory claims in the instant case.

In summary, the Court easily could have construed Fampact to mandate arbitration of statutory disputes, if Fampact had required arbitration of "any" employment dispute. Fampact's arbitration clause, however, only requires arbitration of alleged violations of rights given by Fampact. Even with this failure, however, *Austin* would have permitted this Court to construe Fampact to require arbitration of Rudolph's statutory claims, if Fampact had referred to and contractually bound Alamo to comply with statutes prohibiting discrimination and harassment. But because Fampact neither required arbitration of any employment dispute nor specifically bound Alamo to comply with Title VII and other statutes, the Court simply cannot overcome the elementary and ultimate observation: No where does Fampact memorialize an agreement to arbitrate the statutory claims that Rudolph asserts before this Court.[1]

As the Supreme Court stressed in *Gardner–Denver* and repeated in *Gilmer,* an em-

---

1. This failure is all the more unfortunate because, as this Court's opinion in *Bright* emphatically states, this Court welcomes the opportunity to construe liberally arbitration clauses. Nevertheless, that Alamo itself wrote Fampact only strengthens the Court's conclusion. By writing nebulously in Fampact's rights-giving portion and narrowly in Fampact's arbitration clause, Alamo simply did not contract with Rudolph to mandate arbitration of Rudolph's Title VII right not to be sexually harassed. Even the most robust presumption in favor of arbitration, which this Court resoundingly endorses, *see Bright, supra,* cannot save Alamo from the literal enforcement of the contract that Alamo itself wrote.

ployment contract may well provide arbitration only for contractual claims and not statutory claims, even when both claims may result from the same factual occurrence. *See Gardner–Denver,* 415 U.S. at 49–50; 94 S.Ct. at 1020; *Gilmer,* 500 U.S. at 35, 111 S.Ct. at 1657. The Court finds that Fampact's arbitration clause does exactly that—Fampact provides for arbitration only of alleged violations of Fampact, not alleged violations of Rudolph's rights under Title VII of the Civil Rights Act of 1964 and Section 102 of the Civil Rights Act of 1991.

### III. Conclusion

For the reasons discussed above, then, the defendant's motion to stay these proceeding and compel arbitration is hereby DENIED.

The Clerk is DIRECTED to forward a copy of this order to counsel for both parties.

It is so ordered.